B104 (FORM 104) (08/07)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS *MEDSCI DIAGNOSTIC, INC.* | DEFENDANTS *State Insurance Fund Corporation* |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.) *Rafael Gonzalez Velez 1806 McKeary, Suite 1-B San Juan PR 00911-1821, Tel 287-726 8866* | ATTORNEYS (If Known) *O'Neill & Borges 250 Munoz Rivera Ave San Juan PR 00918-1813, Tel 787-784-8181* |
|---|---|

| PARTY (Check One Box Only) <br> ☒ Debtor ☐ U.S. Trustee/Bankruptcy Admin <br> ☐ Creditor ☐ Other <br> ☐ Trustee | PARTY (Check One Box Only) <br> ☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin <br> ☐ Creditor ☒ Other <br> ☐ Trustee |
|---|---|

CAUSE OF ACTION (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
*Breach of contract, collection of funds, demand for specific performance, Injunction*

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☐ 13-Recovery of money/property - §548 fraudulent transfer
- ☒ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☒ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☒ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☒ Check if a jury trial is demanded in complaint | Demand $ *40,000,000* |
| Other Relief Sought | |

B104 (FORM 104) (08/07), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | |
|---|---|
| NAME OF DEBTOR<br>PRESCI DIAGNOSTIC, Inc. | BANKRUPTCY CASE NO.<br>10-04961 (ESL) |
| DISTRICT IN WHICH CASE IS PENDING | DIVISION OFFICE | NAME OF JUDGE<br>E.S LAMUT |

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | |
|---|---|
| DATE<br>June 8, 2010 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Rafael Gonzalez-Velez |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MEDSCI DIAGNOSTIC, INC. | CASE NO.: 10-04961 (ESL) |
| Debtor | |
| | CHAPTER 11 |
| MEDSCI DIAGNOSTIC, INC. | ADVERSARY NO.: |
| Plaintiff, | RE: BREACH OF CONTRACT, |
| v. | SPECIFIC PERFORMANCE, |
| STATE INSURANCE FUND | INJUNCTION |
| CORPORATION through its Administrator | |
| ZOIMÉ ÁLVAREZ RUBIO, Esq.; JOHN | PLAINTIFF DEMANDS TRIAL BY |
| DOE; RICHARD ROE; INSURANCE | JURY |
| COMPANIES A, B AND C. | TORT |
| Defendants. | |

## COMPLAINT

### TO THE HONORABLE BANKRUPTCY COURT:

**COMES NOW**, MEDSCI DIAGNOSTIC, INC. (hereinafter referred as MEDSCI), represented through its undersigned attorney and very respectfully states, alleges and prays:

### I.    JURISDICTION

1.    The Honorable Bankruptcy Court has jurisdiction over the present action by virtue of 28 USC 1334(b), 28 USC 1334(e), 28 USC 157 (b)(2)(A, E, O), 11 USC 105(a), 11 USC 542, and Federal Rule of Bankruptcy Procedure 7001(1&7).

2.    Pursuant to cited 28 USC 1334(e)   this court has **exclusive** jurisdiction over the property of the estate created under 11 USC 541 upon the filing of the above captioned Ch 11 case. The most significant asset of said estate, and the only directly

1

producing asset is the contract with SIF from which this action arises. Furthermore, the value and preservation of other properties of the estate consisting of tangible assets is substantially dependent on the instant action.

3.  "To this end the court is given exclusive jurisdiction of all the indicated property [sec. 541 estate property] and of all disputes about ownership or lien interest in that property and about its disposition. In general, the property is brought in custodia legis and accorded the court's protection ..." Treister, Fundamentals of Bankruptcy Law (ALI ABA 2006 Ed.), at §2.01(c)(3)

4.  This action involves matters that are core proceedings, and matters that are non-core proceedings under 28 USC 157. As to the non-core proceedings, Plaintiff consents to the entry of final orders by the Bankruptcy Court, but expressly preserves its right to jury trial, and demands such trial by jury as to all issues so triable.

5.  Supplemental Jurisdiction can and should also be exercised under 28 U.S.C.A. § 1367.

6.  This Court may and should exercise supplemental jurisdiction to claims under Article 1077 of the Puerto Rico Civil Code, 31 Laws P.R. Ann. § 3052, and under section 3081, 31 Laws P.R. Ann. § 3081 for breach of contract.

7.  One reason why exercising such supplemental jurisdiction would be proper, is the seeming emergence of a pattern of activity, by the defendant State Insurance Fund (hereinafter SIF), that indicates that valid existing contracts are being preyed upon, and their owners are often the victims of fraud with prevaricated *scienter*, undue influence and other measures, in an effort to force the holders of contracts to sell,

2

diminish or abandon their contracts in favor of parties that are more "attractive" to the new political regimes, when there is a change at election time.

## II.     THE PARTIES

8.     Debtor, MEDSCI, is incorporated and exists within the Commonwealth of Puerto Rico, with corporate registry number 163283, and Social Security Number 66-0690676. It is dedicated to providing radiology services under contract, to SIF, at three different SIF facilities. MEDSCI filed relief under Chapter 11 of the Bankruptcy Code on June 6, 2010. MEDSCI's principal place of business is located at 1319 Ashford Ave., Suite 1, San Juan, Puerto Rico 00907 (this is the corporate address), and its phone number is (787) 474-3832. It was created, capitalized and financed, exclusively, to bid in order to obtain a contract with SIF, to provide radiology and interpretation services. It eventually did and was successful in its bid.[1]

9.     The State Insurance Fund Corporation (hereinafter referred as "SIF"), is a public corporation with capacity to sue and to be sued with principal place of business at Carr. Estatal No. 21, Esq. Ave. De Diego, Urb. La Riviera, San Juan, Puerto Rico. It is presently administered by Ms. Zoimé Álvarez Rubio, its CEO.

10.     The SIF functions independently by virtue of its enabling statute. It was created back in the 1940's for the purpose of granting workmen's compensation. It holds a monopoly on the claiming and payment of workman's compensation claims in Puerto Rico.

11.     Ms. Zoimé Álvarez Rubio was appointed Administrator of the SIF by the incumbent administration. She is, by information and belief, a member of, or politically

---

[1] **See Exhibit 1, Contract, p. 2.**

alligned with, the New Progressive Party (PNP) of Puerto Rico, and an attorney by training. She is resident and domiciliary of Guaynabo, Puerto Rico.

12.     Unknown Defendants are SIF employees or collaborators, or attorneys, who acted with *scientier* and/or which entered into agreements with radiologists of unknown names, to "farm out" some of the patients which, pursuant to the existing contract, should have been attended to by SIF, at its own facilities, using Plaintiff's equipment and doctor.

13.     "A" Insurance Company is an insurance company incorporated under the laws of the Commonwealth of Puerto Rico and/or a place other than the Commonwealth of Puerto Rico, which issued a policy or policies to cover some or all of the risks and/or occurrences incurred by SIF, and/or mentioned in this complaint.

14.     "B" Insurance Company is an insurance company incorporated under the laws of the Commonwealth of Puerto Rico and/or a place other than the Commonwealth of Puerto Rico, which issued a policy to cover some or all of the risks and/or occurrences incurred by Zoimé Álvarez Rubio, and/or other mentioned officers, and or employees, and/or advisors mentioned in this complaint.

15.     "C" Insurance Company is an insurance company incorporated under the laws of the Commonwealth of Puerto Rico and/or a place other than the Commonwealth of Puerto Rico, which issued a policy to cover some or all of the risks and/or occurrences incurred by Unknown Defendants, SIF's employees, and/or other mentioned employees and/or advisors and or officers and directors mentioned or not still identified, in this complaint.

### III.     FACTUAL BACKGROUND

(All prior paragraphs and all addenda and Exhibits attached to or filed simultaneously with this Complaint are hereby incorporated by reference and made an integral part of the pleadings.)

16.     Prior to September 1st, 2007, MEDSCI negotiated, with SIF, a contract to provide exclusive radiology services for the regions of Carolina, Mayagüez, and Ponce, Puerto Rico, as well as x-ray services at Hospital Industrial.  During negotiations, SIF indicated to Plaintiff, or led it to believe, that the amount of patients and related business would total, initially, something between 10 and 12 million dollars per year, total, for all four facilities (Ponce, Mayagüez, Carolina and Hospital Industrial).  Said volume would increase as other, more expensive, service contracts, with outside providers, lapsed.  To accommodate said increase, the contract was drawn for a total of $14,700,000/year and $102,900,000 for seven years.[2]  Plaintiff was further advised that SIF intended to reduce the number of service facilities, in order to provide better quality of service, at less cost.  Thus, the expanded volume could go beyond said amounts and might require additional equipment and training of personnel.  Plaintiff would have to agree to provide both, should the need arise.[3]  Such representations were made, in order to induce Plaintiff to borrow and invest close to seven million dollars in the latest and most sophisticated equipment and install it, at millionaire cost, at SIF facilities.

17.     On or about September 1st, 2007 MEDSCI and the SIF signed the Contract of reference (Exhibit 1).  **The Contract allowed MEDSCI a period of six months to install its equipment.  The equipment was ordered and installed in timely fashion.**

---

[2] **See Exhibit 1, Contract, p. 4.**

[3] **See Exhibit 1, Contract, p. 3.**

5

18. Even though the contract said nothing about continuation of services during installation, MEDSCI, at its own cost, retained the equipment of its predecessor, and organized matters so as to have as little "down time" as possible.

19. **Essentially, the parties agreed that MEDSCI would invest close to seven million dollars in brand new, latest technology equipment, to be installed at Plaintiff's cost, at SIF's facilities at Carolina, Ponce, Mayaguez and Hospital Industrial. In exchange, SIF agreed to provide radiological services, to its insured patients from said regions, exclusively at its own facilities, using Plaintiff's exclusive services.[4] Said volume of patients would represent, according to SIF, a minimum of $10,000,000 and a maximum of $14,700,000 per year, in billing, for the duration of the contract. MEDSCI would perform and interpret the medical tests,[5] while SIF would provide the technical staff needed to service said volume of business.[6] With regards to the latter, SIF imposed the conditions that MEDSCI could not retain its own technical personnel, but would have to perform all the contracted technical procedures using SIF staff and that only SIF related services could be provided by Plaintiff.[7] Thus, Plaintiff cannot supplement its income with outside business, if the SIF related business results inadequate to meet its financial commitments.**

20. **Because of the recognized need to obtain substantial financing and because that would require full guarantees by MEDSCI's principals, prompt**

---

[4] **See Exhibit 1, Contract, p. 4.**

[5] **See Exhibit 1, Contract, p. 4**

[6] **See Exhibit 1, Contract, p. 3.**

[7] **See Exhibit 1, Contract, p. 4.**

payment for MEDSCI's services was agreed upon.[8] It was fully understood that MEDSCI would need the cash flow provided by SIF's prompt payments, in order to pay its suppliers, maintain its equipment and service its debt. In fact, SIF's payments, by agreement of the parties, come in the name of MEDSCI and the bank.[9]

21.   The above referenced loan and the underlying business decisions, including the decision to apply for the loan, were based upon SIF's business volume representations.[10] The business volume representations served as a basis for the financial projections that supported the decision to accept SIF's terms and that were presented to the bank. Without them, the loan could not have been granted, nor would it have been solicited. The financial projections show that the business volume represented by SIF was necessary to generate the cash flow needed to operate successfully. Without it, MEDSCI would not be able to meet the monthly debt service obligation, and other obligations of weight such as local municipal and insular taxation. SIF was, at all times relevant, cognizant that MEDSCI had obtained approval from its bank for loans and lines of credit approaching $7,000,000.00, in order to purchase and install the new equipment required by SIF, and that said approval was based on the projections.[11] The loans were eventually made and the equipment purchased and delivered to the SIF facilities.

22.   Once the equipment was at the facilities, on its way, or at times relevant, Plaintiff found out that the weight of the new MRI unit could not be properly borne by SIF's Ponce facility slab. SIF should have advised MEDSCI of the fact, prior to the

---

[8] See Exhibit 1, Contract, p. 5.

[9] See Exhibit 3 and 4, Statements Under Penalty of Perjury of Mr. Osvaldo Carlo, Esq., par. 8 and of Mr. Ralph Vallone, Esq., par. 8.

[10] See Exhibit 2, Compiled Financial Projections.

[11] See Exhibit 3, Statement Under Penalty of Perjury of Mr. Osvaldo Carlo, Esq., par. 8.

contract, as it was aware of the capacity of its facilities and the specifications of the equipment.[12] It failed to do so. At a cost of approximately one million dollars, MEDSCI then proceeded, with SIF approval, to effect and complete various improvements in the various facilities, including Ponce, and to "shore up" the foundations and repair the spaces to be occupied, so as to be able to install the new equipment. Other vexing contingencies were discovered in Mayagüez and Carolina, but all were the object of careful attention by MEDSCI. The above situations occurred notwithstanding the fact that the equipment was chosen pursuant to SIF's demands and thus, SIF should have advised Plaintiff, of its buildings' limitations.

23. During the year 2010, SIF requested improvements and additions which were not contemplated on the equipment list of the contract, and these were performed by MEDSCI, at an additional, non programmed cost, of over $50,000.

24. On or about March 2008, MEDSCI had completed installations at the SIF facilities of Ponce, Mayagüez, Carolina and Hospital Industrial.

25. MEDSCI at all times relevant acted in good faith and has, at all times, performed beyond the requirements of the contract.

26. At all pertinent times the SIF was the knowledgeable party regarding its volumes. SIF presented a proposed Contract to MEDSCI which considered the SIF's volumes of work and needed equipment. The projected volumes were supplied by SIF and reflected the expected increase in traffic, as well as SIF's intention of concentrating it in fewer facilities, with better equipment and capacity. The contract was carefully examined and a small number of suggestions on changes were provided by MEDSCI. No

---

[12] **See Exhibit 1, Contract, page 2 and Exhibits 3 and 4, Statements Under Penalty of Perjury of Mr. Osvaldo Carlo, Esq., par. 8 and of Mr. Ralph Vallone, Esq., par. 8.**

significant change was allowed and the matter was presented to Plaintiff in "take or leave it" terms.[13]

27. MEDSCI relied on SIF to provide the correct amounts of tariffs and billing to be expected, which were included as an Exhibit to the Contract, and at the footnote of page four (4) (a total of up to $102,900,000.00 for seven (7) years). This amount was divided, by SIF, into annual requirements of approximately $14,700,000.00 per year.[14]

28. MEDSCI submitted these amounts and the resulting financial projections to its Bank and, based on these representations and the financial projections derived from them, the loans needed to obtain the equipment, were granted.

29. Both of the stockholders of MEDSCI concur that they would have never borrowed such an amount, or placed their personal guarantees and estates at risk, for the greatly diminished volume presently provided by SIF.

30. In inducing MEDSCI to sign, on the basis of the amount of $102,900,000.00 and then not providing the volume, the SIF committed fraud in the inducement and/or deceit ("dolo") and/or has acted in bad faith in the development of the issues. SIF, as of June 6, 2010, owed MEDSCI $1,369,137, of which $743,214 is more than 60 days due, an amount that has caused MEDSCI to fail in its payments to the bank and to key maintenance and other suppliers and entities.[15] Presently, SIF's behavior has precipitated a "cash crunch" which MEDSCI believes is intentional and with *scientier*. Indeed, the Administrator indicated, during a meeting held in 2009, that she had ordered

---

[13] **See Exhibits 3 and 4, Statements Under Penalty of Perjury of Mr. Osvaldo Carlo, Esq., par. 8 and of Mr. Ralph Vallone, Esq., par. 8.**

[14] **See Exhibit 1, Contract, p. 4.**

[15] **See Exhibit 5, Aging Report.**

her lawyers to find out how SIF could "break" the MEDSCI contract, but had found it legally impossible to do so.[16] At this very same meeting she addressed the amount of the contract and said that MEDSCI should have signed four (4) separate contracts to cosmetically deal with the public opinion over the amount. MEDSCI indicated this was not within its control or its policy.

31.     SIF has never addressed MEDSCI to, under the terms of the contract, refuse payment of amounts in arrears or point out any serious deficiencies. It has never sent a default letter of any type, except as a result of the above described cash crunch, produced by SIF's own failure to honor the contract. Even then, Plaintiff's principals dug into otherwise necessary funds, and paid, to the tune of tens of thousands of dollars, the funds needed to service the equipment.

32.     At the time of this filing all equipment is operable.

33.     The Contract was signed for a global amount of $102,900,000.00.

34.     This Contract was proposed as one (1) document by the SIF which prepared the contract and submitted same to MEDSCI. The same included its tariff per case schedule and its expected yearly amounts of payment. In layman's language, the terms of the contract were, among others, that MEDSCI would replace obsolete existing equipment with new, state of the art equipment, as listed in the Contract. MEDSCI would also create a tele-radiology network. It was a *sine qua non* provision and recital of this Contract, that SIF would pay billings as "quickly as possible.[17]

---

[16] See Exhibits 3 and 4, Statements Under Penalty of Perjury of Mr. Osvaldo Carlo, Esq., par. 8 and of Mr. Ralph Vallone, Esq., par. 8.

[17] See Exhibit 1, Contract, p. 5, line 17.

The Contract, which is, substantially, one of adhesion, was prepared by SIF.

## IV.    FIRST CAUSE OF ACTION-BREACH OF CONTRACT
(All prior paragraphs and all addenda and Exhibits attached to or filed simultaneously
with this Complaint are hereby incorporated by reference and
made an integral part of the pleadings.)

35.    Since approximately sixty to ninety days after signing, to the present,

SIF's non-compliance with the Contract has been present. The SIF has routinely owed

MEDSCI six and seven figure amounts, as well as substantial, over sixty and ninety days

amounts. Originally excuses were given to MEDSCI indicating that such delays were due

to the changes in SIF payment mode, but the pattern continue.

36.    Meanwhile, MEDSCI has performed and at all times has been ready,

willing and able to comply with all its obligations under the Contract.

37.    Yet, since late, 2009, performance has been hindered for reasons outside

MEDSCI's control and attributable to SIF and its agents.

38.    SIF has failed and still fails and refuses to perform many of its essential

duties under the Contract. SIF's noncompliance falls, mostly, in three areas.

39.    The first is that, SIF unjustifiably and in violation of the exclusive

disposition agreed in the Contract, routinely refers patients to outside providers.

40.    Furthermore, SIF fails to promptly reestablish referrals to MEDSCI, when

services have been interrupted for any reason and the interruption ends.

41.    The continuous practice of outside referrals has reduced the expected

business volume by, approximately 50% and, thus, gravely deteriorated MEDSCI

finances. Said practice clearly shows SIF's bad faith and/or intentional noncompliance

with the terms of the contract. The reduced volume was such that, for 2008, MEDSCI

registered a loss of $40,000.00. The second year, 2009, registered such a diminished volume that MEDSCI accumulated losses amounted to $952,149.

If SIF had complied with the terms of the Contract, each year would have yielded a net income of $4,992,982, as per the financial projections and, in fact, more.[18]

42.     With this practice, added to its failure to promptly pay for the services provided and other noncompliance described below, SIF is forcing MEDSCI into noncompliance with its financial obligations. That includes its creditors and service contractors, and tax obligations. Furthermore, MEDSCI's inability to promptly pay its equipment maintenance contractors, necessarily affects its ability to provide the services to SIF. Thus, SIF's behavior has the added effect of creating the unjust appearance of inferior compliance by MEDSCI. Plaintiff respectfully submits that SIF's behavior, added to its Administrator's expressed desire to break the contract, as well as other acts directed at making MEDSCI's compliance more difficult than it should, or outright impossible. Such behavior points to or evidences an intentional noncompliance by SIF. The intention, of course, is to bend MEDSCI to its will, or break it.

43.     During the relevant period, SIF has also failed to provide adequate personnel to conduct the radiological tests, as required by the contract. The matter is made worse by the contract, which prohibits Plaintiff from appointing its own personnel. MEDSCI is thus fully constricted by SIF.

At the time of negotiations and in the body of the written contract, the spirit expressed by SIF was that the quantity and quality of the services would be expanded.

---

[18] **In truth, the net profit would have been higher. The projections, as required by the bank, were conservative. The historical operating expenses were lower than projected. See Exhibit 8 Financial Statements for the years ended December 31, 2009 and 2008.**

That spirit was not limited to high sounding platitudes in the introduction. Specific provisions were included, by SIF, in the contract, requiring MEDSCI to train additional personnel and provide additional machinery, as the need arose during the life of the contract. Thus, MEDSCI was led to believe that SIF meant to expand and make full use of the equipment to be acquired.[19]

44.     SIF deliberately does not employ sufficient technicians to operate all the equipment to its maximum around the clock efficiency. The technicians are not replaced when sick, on vacation or on other legitimate leave. This practice, in addition to the constant referral of patients to outside contractors, has severely reduced the production capacity and severely cut into MEDSI's income.

45.     In following this practice, SIF has at all times relevant acted in bad faith. The equipment required by SIF, and installed by MEDSCI, is designed to operate 24 hours a day, with minimum down time for maintenance, is more energy efficient and requires less stringent operating conditions that the equipment it replaced. That great capacity comes at a very high initial cost but, if exploited, results in substantial economy and better quality of service and product.

The SIF was fully cognizant of the above and expressed its willingness to provide the technical personnel and access, to permit the effective use of the equipment. MEDSCI paid the high initial cost, SIF it has never complied with its part of the agreement.

---

[19] See Exhibit 1, Contract, p. 3, par. "F".

46.     Finally, SIF has unduly delayed the payment of the severely reduced billing. Said practice, is again proof of bad faith. Taken together with the reduced volume, it is the cause of Debtor's insolvency.

47.     SIF has demonstrated a pattern of activity that would indicate that valid existing contracts are being preyed upon, and their owners are often the victims of fraud with prevaricated *scienter*, undue influence, and other measures in an effort to force the holders of contracts, to sell or abandon their contracts in favor of parties that are more "attractive" to the new political regimes, when there is a change at election time.

48.     The SIF has barefacedly indicated to officials of MEDSCI that MEDSCI must continue providing services whether or not it is paid.[20]

49.     In Puerto Rico the *pacta sunt servanda* (agreements must be respected) doctrine, rules as law, which establishes that the parties who have entered into an agreement are bound by it, making said agreement "the law" between them. 31 Laws P.R. Ann. § 3375 (2006); Álvarez de Choudens v. Rivera Vázquez, 165 Dec. P.R. 1, 18 (2005); Nike Int'l Lmtd. v. Athletic Sales, Inc., 689 F. Supp. 1235, 1245 (Dist. P.R. June 30th, 1988).

50.     To that extent, "[o]bligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations." 31 Laws P.R. Ann. § 2994 (2006).

51.     As a result of SIF' breach of contract, evidenced by SIF letter of March 18, 2010, as to the amounts of payments made in 2008 (approx $2.600,000.), 2009

---

[20] See Exhibit 4 Statement Under Penalty of Perjury of Mr. Ralph Vallone, Esq.

($3,100,000), and to said date in 2010 ($633,401),[21] MEDSCI has to date lost

contractually agreed revenues it reasonably estimates in the amount of no less than

$30,000,000.

52. Unless SIF is forced to comply with the terms of its contract, MEDSCI

will suffer (and has suffered) irreparable loss and will be unable to develop and comply

with a viable Plan of Reorganization. If that happens, it will be forced into liquidation.

53. Relations between the SIF and MEDSCI are so strained, that the outside

attorneys for SIF have informed the vice president of MEDSCI that MEDSCI must

communicate any contractual complaint or allegation through them.[22]

On June 6th 2010, after the filing of the Chapter 11 proceeding, MEDSCI advised

the Administrator or of the fund by email of its Vice President, that it would continue to

render services if payment for amounts owed was made.[23] MEDSCI has continued to

serve, but has not received a payment after its filing of the Chapter 11 proceeding.

54. SIF has further engaged in "impossible demands" such as the demand, on

a Friday morning, that equipment be repaired in 12 hours, only to indicate that the

facilities would not be open on the weekend to repair them.[24] In fact arrangements to

have access for maintenance had already been made with local management.[25] Central

SIF management set those arrangements aside, while simultaneously making their

demands for "12 hour" maintenance under penalty of cancelation of the contract. Said

---

[21] **See Exhibit 6, letter of March 18, 2010. See also Exhibit 8 Financial Statements for the years ended December 31, 2009 and 2008.**

[22] **See Exhibit 7A.**

[23] **See Exhibit 9.**

[24] **See Exhibit 7A, letter of May 7, 2010. See Exhibit 7B, E-mail of May 7, 2010.**

[25] **See Exhibits 3 and 4, Statements Under Penalty of Perjury of Mr. Osvaldo Carlo, Esq., par. 8 and of Mr. Ralph Vallone, Esq., par. 8.**

demands, besides being clearly unreasonable and in bad faith are also contrary to the letter of the contract, which specifies 30 days to cure any deficiency.[26] MEDSCI has at such times had to exercise extraordinary efforts in order to have facilities available for repair, while in the industry, such access is, customarily, "around the clock".

55. Until today, as a result of the above described gross noncompliance, by SIF, with the terms of its contact with MEDSCI, the latter has suffered substantial loss of business, due to insufficient referrals by SIF. MEDSCI has also suffered losses in tax penalties, interest on money it should have had, and untrue down time reported by SIF, in order to refer cases to other radiologists. The above actions have constituted, in the least, a classic breach of contract. Plaintiff has a right to SPECIFIC PERFORMANCE plus damages, in the form of loss of income.

56. Willful noncompliance with the terms of a contract or obligation, with understanding of the effect upon the person or entity with the right to the performance, constitutes, under Commonwealth law, a form of incidental "dolo". Said "dolo" gives rise to an obligation, by the delinquent party, to compensate its victim for all losses it may have suffered as a result of the default. If this Honorable Court finds that SIF's noncompliance constitute "dolo", then, damages in addition to loss of income would be the adequate remedy. SIF's behavior, regarding the failure to refer the patients to MEDSI, its late payments and the constricting techniques described which include the failure to supply sufficient personnel, have been used all along to constrict and damage MEDSCI and certainly have been willful. This count should award specific performance and damages in TORT under the above criteria.

---

[26] See Exhibit 1, Contract, p. 10.

57.     To the present, Plaintiff's damages are estimated at no less than the

minimum yearly billing, as per SIF's representations, multiplied by the number of years

and fractions of years that have passed, less the actual billed payments resulting from the

tests actually performed. The evidence may show that the patients that should have been

diagnosed, pursuant to the exclusivity clause, would have produced a higher level of

billing than the minimum. In that case, the higher level would  constitute the new

minimum yearly billing or base, from which the actual billing must be subtracted, to

determine Plaintiff's losses. To the result of the prior calculation, the loss of income

from interest, plus late charges and penalties paid or accrued, plus loss of investment

potential or interest on profits, must be added.

## V.      SECOND CAUSE OF ACTION-FRAUD OR DECEIT ("DOLO") WHILE INDUCING PLAINTIFF TO AGREE TO THE TERMS OF THE CONTRACT
(All prior paragraphs and all addenda and Exhibits attached to or filed simultaneously
with this Complaint are hereby incorporated by reference and
made an integral part of the pleadings.)

58.     In addition to its jurisdiction over the estate, as explained above, this

Honorable District Court can exercise its jurisdiction over the present cause of action

under 28 U.S.C.A. § 1367.

59.     Under Puerto Rico's contract law, if a party is induced to agree to a

contract by means of false representations or deceit, of such severe nature that, in its

absence, the victim would not have agreed to the contract, this would constitute a vice in

consent. Said vice would annul the contract and give rise to damages. (T.31 LPRA 3409)

If the deceit was less severe and would only have affected the terms of the contract, or its

profitability, then the contract may stand, but the guilty party must pay damages to the

victim.

60.     Although it is not, presently, Plaintiff understanding of the facts,

MEDSCI, in this case, might have been a victim of deceit, at the time of the agreement.

It was led to believe that, if it agreed to the terms of the proposed contract, a certain

volume of business would follow and the ensuing services promptly paid.  If Plaintiff had

been told the truth regarding the volume of business, personnel availability and lack of

timely payment to be expected, it would never have agreed to the terms of the contract

proposed by SIF.  At a minimum, it would have refused to invest the amount required by

SIF's demands and charged more for the services, in order to cover the cost of the

delayed payments.  Defendant's representations, if made with fraudulent intent, give rise

to an action commonly referred to as "dolo" or deceit. This DOLO may be "incidental" or

"grave" within the definitions of the Code and cause SIF to have to pay the entire

contracted amount minus projected costs of operation, discounted to the date of the

Judgment.

61.     MEDSCI avers that the facts support a judgment to the effect that there

was deceit in the inducement of Plaintiff to agree to the terms of the contract (*in*

*contrahendo*).  In so stating, Plaintiff is fully cognizant of the ruling of

*Ashcroft v. Iqbal,*[27] regarding multiple explanations for a given behavior, some of which

may be innocent.  In this case, though, there can be no innocent explanation of

defendant's actions.

Either, the business volume, represented by SIF was never meant to be treated in

house, by SIF, using the equipment Plaintiff was led to buy and install at its facilities

(and, certainly, SIF cannot claim lack of knowledge), or SIF is intentionally diverting

---

[27] 129 S. Ct. 1937 (2009)

patients. Both alternatives are guilty ones and have the same essential effect upon Plaintiff.

Plaintiff is of the opinion, it must be said, that the second alternative is the one that reflects the truth – that SIF originally intended to comply with the terms, and the spirit, of the contract. That is Plaintiff's subjective judgment, though. The objective evidence supports both alternatives and thus, both must be alleged. *Iqbal* does not go so far as to suggest that if two equally guilty alternatives are equally supported by the known facts, Plaintiff must renounce them both or choose one arbitrarily.

62.     "If there was a corrupted consent, then the will to enter into the contract was construed in a faulty way. The will to contract assumes a perfect knowledge of the agreement's implications and the liberty to want its consequences." (Our translation)[28] José R. Vélez Torres, *Curso de Derecho Civil: Derecho de Contratos* vol. II, Ch. II, p. 45 (Univ. Interamericana de P.R. 1990). In such a DOLO GRAVE case, only one party can have committed such. Otherwise, the mutual bad faiths neutralize each other and good faith dealing will be assumed. In the present case, as pleaded and supported herein, only SIF can be found to have committed the acts that configure the DOLO GRAVE. Thus, if proven, the full remedies afforded to the victim, by the Civil Code, are available to Plaintiff.

63.     MEDCSI conducted negotiations with SIF, and SIF induced MEDSCI to sign the contract on the basis of an amount of $102,900,000.00 in business, to be distributed evenly during the life of the contract. SIF has not provided the volume.

---

[28] "Un vicio del consentimiento existe, por consiguiente, siempre que la voluntad contractual se haya formado defectuosamente. La voluntad contractual presupone un perfecto conocimiento del alcance del negocio y libertad para querer sus consecuencias."

Plaintiff avers, as an alternative explanation of the facts, that SIF always knew it would not. SIF's made the false representation because it knew that no sane businessman would invest the amount required to supply the equipment desired by SIF, if provided with accurate information as to the volume of business that SIF intended to provide.

64.    In that case, the SIF has acted in bad faith, since IT and NOT MEDSCI was in control of all statistics and numbers necessary to set a contract value and fix tariff rates.

65.    As a result of the above, MEDSCI has suffered losses to date, in the amount of, not less than, $30,000,000. If DOLO GRAVE is found, MEDSCI has suffered lost business losses of approx. $93,000,000, for the duration of the contract, plus interest and damages, minus projected operating costs and discount for time.

## VI.    THIRD CAUSE OF ACTION-DAMAGES INCIDENTAL TO CONTRACT, AND/OR IN TORT
(All prior paragraphs and all addenda and Exhibits attached to or filed simultaneously with this Complaint are hereby incorporated by reference and made an integral part of the pleadings.)

66.    As a direct result of SIF' breach of contract, MEDSCI has suffered and still suffers the loss of commercial credibility before its creditors, and within its field of operation, which damages MEDSCI estimates in an amount no less than $10,000,000. Had MEDSCI been allowed to perform, it would have recommended itself creditably to others and would have in addition to enjoying good credit, have very possibly expanded its government and government related business. It has, also, been forced to incur in late fees, interests and penalties for an amount of, not less than, $100,000.00.

## VI.    FOURTH CAUSE OF ACTION-DAMAGES
(All prior paragraphs and all addenda and Exhibits attached to or filed
simultaneously with this Complaint are hereby incorporated by reference and
made an integral part of the pleadings.)

67.    Because of SIF's failure to advise MEDSCI, prior to the negotiations, of

the limitations of the Ponce facility slab, and its true "office" or "site" deficiencies, and

of other site deficiencies ,Plaintiff had to invest an additional $905,572.73, not considered

during the negotiations.  In addition, Plaintiff had to pay additional loan costs and closing

fees, corresponding to said additional amount, and has had to pay interest on these

improvements which upon termination of the contract would accrue to SIF. If SIF

receives these without actually complying with the volume and payment terms of the

Contract, it will have been unjustly  enriched.

68.    MEDSCI has also suffered "loss of interest" on a perpetual balance due

from SIF of approximately $1,400,000, to the tune of approximately $175,000 to date, an

amount which increases at the rate of $205.50 daily.

## VII.    FIFTH CAUSE OF ACTION-INJUNCTION
(All prior paragraphs and all addenda and Exhibits attached to or filed
simultaneously with this Complaint are hereby incorporated by reference and
made an integral part of the pleadings.)

69.    The contract between SIF and Plaintiff is the result of a public policy

decision to treat the insured in house, with the best equipment and at the lowest cost to

the SIF.  Said policy is in accordance with the enabling law of the SIF and public policy

of the Commonwealth of Puerto Rico, to provide the best treatment to the insured

workers.  The breaking of the contract operates against said policy and constitutes a

dereliction of duty by the SIF and its Administrator.  Said dereliction will force the SIF to

outside providers, who charge more and do not have the same legal obligation to provide

21

the service. Furthermore, it will constitute a flagrant waste of the institution's resources, inasmuch as the unionized technicians will continue drawing their salaries, while they will not be able to perform their duties at the SIF's facilities.

70.     Complying with the terms of the contract constitutes a ministerial duty of the SIF's Administrator and in failing to do so she becomes the valid subject of the injunctive power of the Court.

71.     MEDSCI, meanwhile, has been driven to file bankruptcy and, if the contract is not timely enforced by this Honorable Court, it will be unable to reorganize successfully, will cease to be a viable operation and will disappear as an entity. Such failure constitutes irreparable damage, for injunction purposes. *Semmes Motors, Inc. v. Ford Motor Company*, 429 F.2d 1197

72.     The facts and events alleged and evidenced in this Complaint give Plaintiff a right to demand specific performance, plus damages. Furthemore, said facts and evidence make it probable that Plaintiff will prevail in this action. A protracted proceeding, even if successful, will not provide an adequate remedy, because time, without the income that should be provided by the performance of the contract, will most probably drive Plaintiff to ruin. Plaintiff avers that that is precisely SIF's intent. It should not be allowed.

### VIII.   SIXTH CAUSE OF ACTION-COLLECTION
(All prior paragraphs and all addenda and Exhibits attached to or filed simultaneously with this Complaint are hereby incorporated by reference and made an integral part of the pleadings.)

73.     Since early in, SIF started to delay the payments and has accumulated a total debt, for services rendered, of $1,369,137 of which $743,214 is in arrears. Other

22

amounts achieve that status daily. Plaintiff believes the amount may more readily approximate $1,000,000.00 due to the late entry of billings into its system by SIF.

74.    Said delay is the immediate cause of Plaintiff's bankruptcy and if not corrected, will result in the impossibility of reorganization as an operating entity.

75.    MEDSCI demands immediate payment of all amounts due over sixty (60) days.

## IX.  JURY DEMAND

76.    MEDSCI demands Trial by Jury, as to all issues that can be so tried.

**WHEREFORE**, it is respectfully requested Judgment in favor of Plaintiff, MEDSCI, and against defendants as follows:

a)    If the Hon. Court finds DOLO GRAVE, that it find that, MEDSCI has suffered lost business losses of approx. $93,000,000. plus interest and damages, minus projected operating costs and discount for time, declaring the Contract Null under provisions of existing law.

b)    That in the alternative, if this Hon. Court finds that there was DOLO INCIDENTAL, that it declare and adjudge that the Contract is in full force and effect, and compel SIF to fully comply in good faith with all the terms and conditions agreed in the Contract, with damages to the present date in an amount not less than $40,000,000.

c)    That in the alternative, if this Hon. Court finds that there was a simple breach of Contract on the part of SIF, that it award MEDSCI a minimum of $30,000,000 for breach of Contract losses in patients not attended to and referred to outside contractors, plus other damages as detailed within.;

d)     Award MEDSCI $10,000,000. for business reputation damages;

e)     Award MEDSCI the just amount for such proven items, for late fees, interest and penalties paid to the bank, government or others;

f)     Award MEDSCI $500,000 for inducing it into a contract to supply and install equipment while withholding the fact that the Ponce facility and others would need and require a further delaying investment in the structures of the facility; Award MEDSCI $50,000 for equipment installed by SIF's but not contemplated in the contract.

g)     Award MEDSCI $175,000 for interest on balance due;

h)     Issue a preliminary, provisional and permanent injunction, ordering SIF to perform specifically with the terms of its contract with Plaintiff, including providing in house service to the promised number of patients and paying Plaintiff, for its services and the use of its equipment, in a timely manner, no to exceed sixty days from the time the patient was attended to;

i)     That in all cases this Hon. Court consider that SIF has been the cause of MEDSCI's insolvency with Attorney's fees, costs and expenses of litigation to MEDSCI.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 8th day of June, 2010.

/S/Rafael González Vélez
Rafael González Vélez
USDC No. 124311
1806 Calle McLeary Suite 1-B
San Juan, Puerto Rico 00911
E-mail: rgvlo@prtc.net
Tel. 787-726-8866
Fax 787-726-8877