IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PUERTO RICO


MEDSCI DIAGNOSTICS, INC.       *    Case No. 10-4961
                               *
------------------------------*
                               *
MEDSCI DIAGNOSTICS, INC.       *
                               *
            Plaintiffs         *
                               *
            Vs.                *    Adv. No. 10-94
                               *
STATE INSURANCE FUND CORP.     *
                               *
            Defendants         *
_____  *    June 18, 2010
------------------------------*    Old San Juan,
                                    Puerto Rico


**HEARING**

BEFORE THE HONORABLE ENRIQUE S. LAMOUTTE
FEDERAL BUILDING, OLD SAN JUAN, PUERTO RICO


APPEARANCES:

For the Trustee:

For the Debtor:            Rafael Gonzalez Velez, Esq.

                           Edgardo Munoz, Esq.
                           For the Debtor in Possession

For the Creditors:         Luis Marini, Esq.
                           Mauricio Muniz, Esq.
                           For SIF

Present:                   Mayra Domenech
                           Gen. Counsel, SIF
CD:                        Official Courtroom Deputy

CERTIFIED TRANSCRIBERS, INC.
1075 Carr. 2 Plaza Suchville #302
Bayamón, Puerto Rico 00959
Tel. # (787) 783-6623; (787) 617-9487

2

P R O C E E D I N G S

1

2                                           (10:39 a.m.)

3                        (Case is called)

4        THE COURT:  The Court has scheduled an

5   expedited emergency hearing on Debtor's claim to its

6   urgent motion for turnover of property, injunction,

7   and cease and desist order, and/or extraordinary

8   relief.

9            Are there any parties in interest present?

10       MR. GONZÁLEZ VÉLEZ:  Your Honor, Attorney

11  Rafael González for Debtor/Plaintiff in the

12  adversary.

13       MR. MUÑOZ:  Good morning, Your Honor.

14  Edgardo Muñoz representing Debtor in possession.

15       MR. MARINI:  Good morning, Your Honor.  This

16  is Luís Marini of O'Neill & Borges.  I am here for

17  the State Insurance Fund.  I have a number of people

18  from my office as well: my partner, Mauricio Muñiz,

19  Carlos Algardía, and Ana Margarita.

20           And, Your Honor, sitting with us is the

21  general counsel for the State Insurance Fund as well.

22  It's Mayra Domenech.

23       THE COURT:  I'd like the parties to give me

24  a brief summary, introduction, of what you're going

25  to present.

1          MR. GONZÁLEZ VÉLEZ:  Yes, Your Honor.

2          THE COURT:  Your argument and the evidence.

3          MR. GONZÁLEZ VÉLEZ:  Yes, Your Honor.

4          Your Honor, essentially, what we intend to

5    show through the witnesses and the documents, most of

6    which are already part of the record and were

7    presented with of the complaint, and there was a

8    subsequent statement that, this morning, arrived at

9    our hands, and we -- we filed.

10          It's that the State Insurance Fund,

11   Defendant, during 19 -- I mean, 2007 -- I'm showing

12   my age -- needed substitute supply of services and

13   equipment for the regions of Ponce, Mayagüez, and

14   Carolina.  That was the result of the end of the

15   contract of the prior supplier of those equipment and

16   services.  And they have not had a happy experience

17   with that supplier, had sued them twice for

18   essentially the same sort of allegations that are

19   before this Court.  And, without going into the

20   merit of those, it wasn't happy.

21          So, they wanted new equipment, you know, the

22   latest thing.  They wanted to be able to provide to

23   their patients and insured better quality.  And they

24   wanted it to have a system that allowed the State

25   Insurance Fund to have better records of the nature

4

1   and the findings of all these tests, radiological

2   tests, also for the [Industrial Commission] cases,

3   where many times the [Fund] found that it had lost

4   necessary evidence while in this.  If -- if the

5   system was computerized and if a mention (sic) was

6   kept digitally, which is this system that they wanted

7   provides, they would always have the information

8   available, and they would be able to lose less cases

9   at the State Insurance Fund.

10          So, with that, those lofty goals in mind,

11  they obtained different proposals, and, eventually,

12  they accepted the proposal of Medsci, is essentially,

13  because it was the most complete, because it was the

14  one where the -- where the offerer of the services

15  was willing to be more precise about what dates and

16  what it would provide, and because it -- Medsci was

17  willing to provide or to acquire the old equipment

18  from the old supplier, the one that was leaving, in

19  this case specifically, Medsci -- I'm sorry --

20  Western Imaging and its arm, Radio Sonics, so that

21  that equipment could be fixed that apparently was in

22  a state of disrepair and services could be

23  adequately, at least, provided in a continual manner

24  until the new equipment was put in place for the new

25  way of doing things.

5

1          That would -- the expectation was that would

2     be more or less transparent, the change from one to

3     the other, which was not part of the other side.

4          So, with those criteria in mind, or so it

5     has been represented, they chose Medsci.  In order to

6     induce Medsci -- and because it was true -- it was

7     represented to Medsci that the volume of cases from

8     the three regions in question would amount something

9     between $12 million, $13 million, $14 million per

10    year.

11         The contract, it was drawn for 14.7, but

12    there was no representation that it would be so high.

13     I mean, it was drawn for a bit more in case the

14    quality of the services -- to have space, not to need

15    an additional contract.  But, certainly, it was more

16    than $10 million seeing for the three.

17         That number was not drawn out of the sky.  I

18    mean, it was the result of the statistics of the

19    State Insurance Fund for the three prior years, which

20    reflected that volume as the volume for the three

21    regions.

22         No, no specific representation was made to

23    our client "We're going to build you a meeting hall

24    of 12" (sic), but it was represented that "That is

25    the volume of the region, and you're going to get

6

1  everything in that region".

2           And it should be: $12 million, more or less.

3

4           So, there was a factor of error which was

5  accepted by Medsci of maybe 10%, 15%, up or down.

6           And then, when Medsci proceeded accordingly

7  to buy extremely expensive equipment that would be

8  able to provide the services and satisfy the

9  expectations of State Insurance Fund as represented

10 to them on the premise that they were going to be

11 billing these amounts, because the sort of equipment

12 that the State Insurance Fund wanted and represented

13 needed the sort of volumes that we're talking about.

14 This expensive equipment it cannot be paid for with

15 the sort of volume that are being sent through

16 Plaintiff for the last two years.

17           Now, we understood that the first year there

18 was -- there's a startup and maybe the volumes would

19 not be so high.  If for nothing else, because for the

20 first six months the services could be provided with

21 the old equipment, the equipment that Medsci acquired

22 from Western Imaging which is obsolete equipment and

23 did not have the capacity of this new equipment to be

24 installed.

25           So, necessarily, the first year of the

1  volumes would not be as high.  But it doesn't mean

2  they were low.  Do remember that they had been, for

3  the last three years, generating the volumes that

4  we're talking about: $10 million, $12 million, $13

5  million between Western Imaging, using obsolete

6  equipment, and they were being processed, billed, and

7  paid.

8         So, it's still -- but, from the point of

9  view of Medsci, Medsci accepted that, in the first

10  year, you know, it would not be that high, it

11  wouldn't be maximum efficiency.

12         What has happened is that, even at this

13  year, the volume of the instances is about one-third

14  or less of the expected volume.  And, necessarily,

15  with that sort of volume, the company cannot survive,

16  particularly because the contract provides that no

17  service can be supplied or provided to outsiders,

18  except only [Fund] patients can be referred to this

19  facility and attended to by Medsci -- in fact,

20  they're not attended to by Medsci, it's technicians.

21  The [State Insurance Fund]'s technicians used

22  Medsci's equipment, produced the tests, and then they

23  are interpreted by a doctor which is provided by

24  Medsci.

25         A tele-radiology center was installed by --

1    as part of this proposal, which is probably the

2    largest one in the whole Caribbean Sea, the most

3    complete.  In short, it's -- it's very expensive

4    equipment designed to receive intense use.  It

5    requires expensive maintenance, very expensive.  And

6    the operating costs were originally projected to be

7    close to $5 million.

8         Those projections, we admit, were very

9    conservative.  They were designed both by the gun

10   (sic) and also because the investors in this

11   corporation, which was set up specifically to enter

12   into this agreement with the State Insurance Fund,

13   wanted to ensure that they had a conservative

14   projection to know whether it was worth investing.

15        The fact is that the costs are less.  They

16   are close to four -- not quite -- $4 million a year.

17   But, still, $4 million a year.  And the business

18   that's being referred to Medsci is substantially

19   less.

20        Unless Medsci has reduced its number of

21   insured to less than one-third -- we -- we do realize

22   that the economy is in a very bad situation, but it

23   was very bad in those years that were used for these

24   statistical purposes and the projections -- but,

25   unless it's been reduced to 1/3, then we must

1  understand that the [Fund] is referring those

2  patients to outside contractors instead of referring

3  them to Medsci as it agreed to.

4        I mean, it's too large the difference. 10%

5  maybe explained. 65%, 70% -- it's our contention --

6  can only be sold from referring the things -- I mean,

7  the patients, to outside contractors, with the

8  specific intent of either damaging Medsci and driving

9  it out of business or with the specific -- well, I --

10  beyond that, I cannot speculate; so, I'll leave it

11  there.

12        But it's clear -- not sustainable -- that

13  the volume of cases diminished this much.

14        And it must be remembered, Your Honor, that

15  the contract provides that Medsci will be the

16  exclusive supplier of services for these three

17  regions, meaning that those $12 million in billing

18  should be billed by Medsci, with the exception that

19  Medsci were not able to supply the services, for

20  example, for some instance unforeseen there's a

21  sudden increase in the number of patients, then that

22  would -- or for whatever reason the machinery, or

23  there's no energy in Ponce, for example, for some

24  unforeseen reason and they cannot provide the

25  service, then [Fund] can refer those patients to

1  outside suppliers.

2          But, otherwise, they all have to go to

3  Medsci.

4          We must remember that Medsci does, though,

5  has equipment that can take care of minimal patients

6  than those two entities.  This is the latest, as

7  required by State Insurance Fund, the latest

8  equipment, designed to work 24 hours a day, with

9  expensive maintenance, but provided in short periods

10 of time at off-duty hours, it's that type of thing.

11 So, it's not -- and it also -- they also have backup

12 systems which is part of the consideration that to

13 our understanding [Fund] took in before it handled or

14 gave the contract to Medsci.  It was the redundancy,

15 meaning that if there's some sort of problem --

16          THE COURT:  Mr. González?

17          MR. GONZÁLEZ VÉLEZ:  Yes?

18          THE COURT:  What I've heard is a background

19 --

20          MR. GONZÁLEZ VÉLEZ:  Um hum?

21          THE COURT:  -- to the merits of the

22 complaint --

23          MR. GONZÁLEZ VÉLEZ:  Okay.

24          THE COURT:  -- which -- which I have read.

25          Now, what I want to know is: -- and the

1  complaint that, I think, as of now has not been

2  answered yet.  So, the complaint is the beginning.

3  And I have scheduled this emergency expedited hearing

4  based upon the urgent motion.

5        I want to know what is the urgency and what

6  are you requesting on an urgent expedited basis.

7        MR. GONZÁLEZ VÉLEZ:  Okay.

8        THE COURT:  Because, if it is not granted,

9  it will cause, as I stated in one of my orders,

10  immediate and irreparable harm.

11        MR. GONZÁLEZ VÉLEZ:  Number one, we need

12  payment of outstanding debt.

13        There's amounts of 12 -- I think today it

14  was $800,000-something over 60 days.

15        Furthermore, we need that [Fund] stop

16  referring clients -- and that's why I made that big

17  fuss about it just -- just prior -- stop referring --

18  stopped referring patients to outside suppliers.

19        Because, if it does not, this company is

20  bound to go under, because the costs are -- of

21  operating even at reduced -- are more than what and

22  they are billing to the State Insurance Fund today.

23        THE COURT:  So, you're requesting that the

24  State Insurance Fund complies with the terms of the

25  contract?

1          MR. GONZÁLEZ VÉLEZ:  That's it.

2          THE COURT:  Okay.  I trust that the --

3          MR. GONZÁLEZ VÉLEZ:  That's it.  We're also

4    requesting some sort of compensation for the years we

5    have been in operation and the cases have not been

6    supplied.  But -- but --

7          THE COURT:  Before we go further -- and,

8    since most of those motions were filed on an

9    expedited basis, I -- I admit that I concentrated on

10   the substance of the motion.  But I did not look that

11   closely to the caption nor the cover sheet.

12         But, this morning, upon reviewing again of

13   the documents, I noticed that the Debtor-Plaintiff is

14   requesting trial by jury.

15         MR. GONZÁLEZ VÉLEZ:  Requesting?  Pardon me?

16

17         THE COURT:  Trial by jury.

18         MR. GONZÁLEZ VÉLEZ:  Yes, Your Honor, we

19   did.

20         THE COURT:  So, that's a fresh issue which I

21   have to determine.  Because, if the Plaintiff is

22   requesting trial by jury, according to 28 USC 157

23   (e), this Court cannot entertain the matter unless

24   there is expressed consent of the parties.

25         MR. GONZÁLEZ VÉLEZ:  To the trial by jury?

1          THE COURT:  Yes.

2          MR. GONZÁLEZ VÉLEZ:  We would -- we -- we --

3          THE COURT:  I would not have authority, I

4  mean,

5  I'm --

6          MR. GONZÁLEZ VÉLEZ:  -- we would consent.

7          MR. MARINI:  Your Honor, we would not

8  consent.  And I have -- I don't want to interrupt

9  argument, but I have another threshold issue that,

10  when Brother Counsel finishes, I want to raise as

11  well.

12          MR. GONZÁLEZ VÉLEZ:  Well, we would consent.

13  That's number one.  This --

14          THE COURT:  I'm not saying that there is the

15  right to trial by jury.

16          MR. GONZÁLEZ VÉLEZ:  Okay.  That's the

17  question.

18          THE COURT:  I'm saying that there is a

19  request for trial by jury.

20          MR. GONZÁLEZ VÉLEZ:  And that's also what we

21  -- the other thing we would -- essentially, to put in

22  negative terms the request for compliance, we would

23  say "Cease and desist" to refer to outside

24  contractors those patients from the three regions to

25  which Medsci has contractually exclusive right.

1          That's -- that's putting it on a don't-do-

2     that-any-more point of -- that would be it, Your

3     Honor.

4          Also, Your Honor, at this stage of the -- of

5     how -- of the case, it's -- this is not a jury

6     matter.  This is a preliminary injunction.  It's not

7     a jury -- a jury matter.  But, of course, we could go

8     to the courts to determine whether this emergency

9     request is justifiable and should be granted.  This

10    is not the -- the thing we're here today for is not a

11    jury matter.  It's only at the end --

12         I have been informed just at this moment by

13    Brother Counsel that Debtor-Plaintiff's principal has

14    a -- that if Brother Counsel or Defendants do not

15    accept trial by jury before this Court, we'll

16    renounce to our request for trial by jury.

17         MR. MUÑOZ:  If needed for obtaining today's

18    remedy, urgent remedy.

19         MR. GONZÁLEZ VÉLEZ:  As clarified by Brother

20    Counsel Edgardo Muñoz.

21         Regarding who and the evidence, besides the

22    documents already on record, which we, of course,

23    offer as evidence, we will supply or provide the

24    testimony of Mr. Carlos Ruíz who was the

25    administrator of the State Insurance Fund when this

1   contractual contract was entered into; Don Roberto

2   Reyes Pérez who was the boss of contracting, of the

3   contracting division or office -- chief of

4   contracting at the [Fund] at the time; Doña Monica

5   Vizcarrondo who's the administrator of Medsci; Don

6   Eduardo González Vin who is the CPA who prepared the

7   pro forma, that's the projections, the financial

8   protections before entering into the agreement and

9   asking for the loans, and who also audits the books

10   of the corporation; Mr. Raúl Valón and Mr. Osvaldo

11   Carlo who are the two principals of Medsci who of

12   course have assured the loans and guaranteed the

13   loans that were taken for this matter and who have

14   all the direct knowledge of the events and facts that

15   are alleged in the complaint.

16          That would be our essential evidence.

17          We may add something like the latest or the

18   last audited statements which were not included with

19   the complaint.  But, essentially, that is going to be

20   our evidence.

21          THE COURT:  Mr. Marini?

22          MR. MARINI:  Thank you, Your Honor.  For the

23   record, Luís Marini for the State Insurance Fund.

24          I think Your Honor summarized the issue

25   before the Court today.  First, this is a contractual

16

dispute.  And, in addition to the withdrawal of
reference, which I understand is a threshold issue,
and even if Plaintiff renounces to their right to
trial by jury, my client is not waiving that right.

So, I think the issue certainly is still
before the Court, that it is an important and a
threshold one.

But there's another one, Your Honor.  There
is -- it is an important issue that, I think,
prevents the Court from entertaining the merits of
the allegations in the motion and the merits of the
allegation in the complaint.

And that is, Your Honor, that the
Constitution provides protections to States, to arms
of the States, and to instrumentalities from coming
into a federal court and being sued by a citizen of
that State.  That protection, Your Honor, is notified
in the 11th Amendment and in the Sovereign Immunity
Doctrine.

Now, in Bankruptcy, Your Honor, the
sovereign immunity applies, as this Court well knows,
with some exceptions.  Prior to 1994, before the
amendment of the bankruptcy -- of the Bankruptcy
Code, the law in Bankruptcy was that you could not

1  bring a State and request a money judgment against a

2  State or an instrumentality of a State in a

3  Bankruptcy Court.

4        Now, Congress amended that, Your Honor.  It

5  enacted section 106 of the Bankruptcy Code and

6  specifically included therein a number of provisions

7  for which Congress understands that the States have

8  abrogated their right to request sovereign immunity.

9  And the provisions are listed there.

10       But the intent was to allow a Bankruptcy

11  Court and allow a Plaintiff to assert bankruptcy

12  causes of action against a State, not prepetition

13  causes of action.

14       Originally -- if I may -- I wrote one

15  sentence from the legislative history to the

16  amendment to Section 106 which states -- and I quote

17  -- "Section 106 (a) (1) specifically lists those

18  sections of Title 11 with respect to which sovereign

19  immunity is abrogated".

20       It's about the assertion of bankruptcy

21  causes of action but specifically excludes causes of

22  action belonging to the Debtor that became property

23  of the estate under section 541.

24       The citation, Your Honor, is 140

25  Congressional, H 10, 766.

1          If I may, Your Honor, cases interpreting

2     that legislative history -- and what I'm talking

3     about is in 1-7-10 (sic) from Collier's -- Collier's

4     states -- and I quote -- "What -- summarizing what --

5     explaining what Congress was doing, it states -- and

6     I quote -- "Congress excluded section 541 from the

7     abrogation list, as a result of which Rubberman

8     (sic), Defendants, are still permitted to assert

9     sovereign immunities in proceedings brought by the

10    estate to enforce a prepetition cause of action".

11         Congress apparently did not want to allow

12    the happenstance of a Debtor's Bankruptcy to permit

13    the estate to obtain a recovery against a

14    governmental unit that would not have been otherwise

15    available outside of bankruptcy because of sovereign

16    immunity.

17         That's from Collier's, paragraph 106-21.

18         And that's exactly what is before the Court

19    today.  The State Insurance Fund is certainly

20    entitled to the protections of the 11th Amendment of

21    the Constitution of the United States, the

22    protections of the principle of sovereign immunity

23    that has been so adjudicated by the District Court in

24    the -- most recently, in the case of last year,

25    Berríos vs Nazario, citation 2009 U.S. District

19

1  Court, Lexis 25841, DPR 2009.

2          And that is what is before the Court.  The

3  Court articulated it.  That's how the Plaintiffs have

4  drafted the complaint.  This is a contractual

5  dispute.

6          And the dispute could have been raised,

7  could have been filed one week before the bankruptcy

8  case, it could have been filed today in the State

9  Court, and it would have been the exact same

10 allegations that are before the Court today, with one

11 exception that I'll get into now: and that is the

12 request for turnovers.

13         That, I agree, the request for turnover is a

14 pure Bankruptcy cause of action.  But it is

15 inapplicable to the facts of this case.

16         Because, turnover, under 542, is expressly

17 limited to debts that are mature, payable on demand,

18 or payable on the order.  That is not the case here.

19         542, and the cases interpreting the same,

20 explicitly state -- and I'm going to quote just from

21 one of them that section -- and I'm quoting --

22 "Section 542 is not a provision in the Code to

23 determine the rights of parties in legitimate

24 contract disputes".  This is from In re: FLR Co., 58

25 BR 632, Bankruptcy, Western District of Pennsylvania

1    1985.

2            And that line of cases and that limitation

3    of 542 is consistent in the case law.  You can notice

4    that section to bring in legitimate contractual

5    disputes.

6            And what they have done today, Your Honor,

7    what they are doing through the complaint is that

8    they're using the Bankruptcy Court to bring in a

9    government that couldn't have been brought in the

10   absence of the bankruptcy to assert causes of actions

11   that are precluded by the sovereign immunity

12   principles.

13           And that is a threshold issue, Your Honor,

14   that I think requires a dismissal of the complaint

15   complaint, and that it be asserted, if they want to

16   assert it, in the state courts.

17           I have other arguments, Your Honor, but I'm

18   waiting if you have questions on this one.

19           THE COURT:  Do you have a decision that

20   determines that the State Insurance Fund is an

21   instrumentality of the government which enjoys the

22   sovereign immunity --

23           MR. MARINI:  Yes, Your Honor, I do.

24           THE COURT:  -- protection?

25           MR. MARINI:  And I will cite to them, and I

1   will read you -- the decision is Jorge Luis Berríos
2   Trinidad vs. Carlos Ruíz Nazario.  It's a decision
3   from March 26, 2009, from the District Court of the
4   District of Puerto Rico.
5          And I'm going to quote just one sentence.
6   The decision is very short, but it's exactly on this
7   issue.  The sentence states -- and I quote --
8   "Accordingly, this Court finds that the State
9   Insurance Fund to be immune from suit under the 11th
10  Amendment in the instant action".
11         Prior to that, it is determining that the
12  SIF is a government agency, a government
13  instrumentality, and that it is entitled to the
14  protections of the 11th Amendment.
15         Throughout the opinion, Your Honor, there
16  are other decisions cited previous to that supporting
17  that same conclusion, but that is the most recent one
18  I could find.  It is one from last year, and it is
19  from the District Court in Puerto Rico.
20         THE COURT:  Reply?
21         MR. MARINI:  But, to be clear, I have other
22  --
23         THE COURT:  Well, Counsel, --
24         MR. MARINI:  -- I want to make them now,
25  because I think this issue is -- it's a threshold

1  issue.  If the Court wants me to get into other

2  arguments as well, I will.

3          MR. MUÑOZ:  Edgardo Muñoz on behalf of

4  Debtor.

5          Your Honor, regarding the threshold, the so-

6  called threshold issue of the sovereign immunity,

7  Your Honor, Section 106 cited by Brother Counsel

8  specifically provides for the abrogation of the

9  sovereign immunity even if it exists and it covers

10  the State Insurance Fund, not only for a 542 action

11  but also for a Section 105 action and section 362

12  action.

13          And we are -- we are -- we are basing our

14  adversary proceeding in those three sections of the

15  Bankruptcy Code.

16          Even assuming that section 106 is limited,

17  as stated by Counsel, which we do not consent -- we

18  do not concede, because, if we read section 106, it

19  makes no limitation as to if it's a prepetition cause

20  of action or a post petition cause of action.

21          But, even -- even conceding that for purpose

22  of argument, we have prepetition causes of action and

23  post petition causes of action presented in this

24  adversary proceeding.  This Chapter 11 case is the

25  contract.

23

1        The contract is this Chapter 11 case.   The

2  contract is the estate's most valuable asset by far.

3  Without the contract, this Chapter 11 case will go

4  nowhere.

5        So, this Court has absolute exclusive

6  jurisdiction over the estate, and, if the contract is

7  the very essential part of the estate, it's obviously

8  within this Court's jurisdiction.

9        The protection of that contract involves

10  various post petition actions.   For instance, we have

11  to assume the executory contract.   To assume the

12  executory contract, we must defend, we must preserve

13  the executory contract.   That's a post-petition cause

14  of action.

15        Regarding Section 106, going back to Section

16  106, Your Honor, in this time and instance, there's

17  no constitutional infringement of Section 106 as

18  applied to the States.   And the Supreme Court so

19  decided in at least two cases which ended that

20  problematic view of Section 106 which had -- which we

21  have had to deal with for several years.   But there's

22  a case of Tennessee Student Assistance Corp. vs. Who

23  (sic) reported under 541 U.S. 440; and Central

24  Virginia Community College vs. Katz,  126 Supreme

25  Court Reporter 990.

24

1          Now, going back to Section 106, it does

2    include as those sections under which we can claim --

3    and the state cannot defend itself by raising the

4    immunity -- Section 105, we're claiming an injunction

5    under 105 -- section 362, where claiming that the

6    State Insurance Fund's in dealings with this

7    contract, trying to do away with the contractual

8    rights of Debtor and withdraw -- withholding payments

9    to the Debtor are all in violation of the automatic

10   stay contained in section 362.

11         And we are also claiming that section 542

12   puts the burden on the State Insurance Fund -- and

13   that's a post-petition cause of action -- puts the

14   burden on them to deliver, to turn over all the

15   property of the estate that should be in the hands of

16   Debtor in Possession.  And, right now, it is not,

17   because they are withholding the turnover.

18         Specifically, Your Honor, I would like to

19   cite a case in point.  This case stands for the

20   proposition that failure -- failure of an entity in

21   possession of estate property to turn over that

22   estate property to the Trustee would be a violation

23   of Section 362 (a) (3).

24         Specifically, from the Ninth Circuit,

25   Employment Development Department vs. Paxé (sic) --

1    that's within the bankruptcy case of In re: Del

2    Mission Eltiny (sic), reported under 98 F. 4 1147.

3    Specifically, that case states that normally a

4    failure to pay a debt owed to a Debtor is a violation

5    of the automatic stay.  So, it's a specific case,

6    right on point.

7         Finally, Your Honor, we must acknowledge

8    that those that speak in authorities speak with --

9    among the cases regarding the violation of the

10   automatic stay by withholding payment.  We do

11   acknowledge that.  Because, what we are claiming,

12   that -- the part -- the portion of the automatic stay

13   that we're claiming is being violated by the State

14   Insurance Fund is that part of the automatic stay

15   that prohibits an entity from exercising control over

16   property of the estate.

17        Some cases require something more than the

18   passive non-payment to be interpreted as an exercise

19   in control over property of the estate.  But, still,

20   other cases do acknowledge that even that passive

21   failure to pay is a violation.

22        Among those cases, we have the First Circuit

23   BAP case, Reliable Equipment Corp. (sic) vs. Turabo

24   Motors Corp., which this Honorable Court is familiar

25   with, because that -- that specific case upholds a

1    decision by the Hon. Enrique S. Lamoutte in which he

2    decided that, by not turning over a specific item of

3    property of the estate, that person or that entity in

4    control of that -- in possession of that property was

5    violating the automatic stay.

6          The site of the Reliable Equipment decision

7    in the BAP, Your Honor, is 2002 Bankruptcy Lexis

8    1278.  It's a BAP opinion of October 21, 2002.

9          THE COURT:  Let's assume that I decide that

10   the causes of action pled in the complaint as well as

11   in the urgent motion are not excluded by sovereign

12   immunity because they go to the Court of the

13   administration of the estate.  Assume that.

14         Why would I still have jurisdiction to

15   entertain this action when the Plaintiff requests

16   trial by jury, and 157 (e) requires the consent of

17   all parties?

18         MR. MUÑOZ:  Well, Your Honor, I would

19   respectfully disagree with the wording, because of

20   the right to trial by jury doesn't have anything to

21   do with the Court's jurisdiction over the matter.

22         It has to do --

23         THE COURT:  Well, who can -- well, who can

24   hear it?

25         MR. MUÑOZ:  Excuse me?

1        THE COURT:  Who can hear it?

2        MR. MUÑOZ:  Who can hear it at trial level?

3        THE COURT:  At trial.

4        MR. MUÑOZ:  But, right now, we are

5 requesting an extraordinary relief, the injunction,

6 which is by definition outside of the scope of a jury

7 matter.

8        This is specifically the kind of thing that

9 we cannot ask --

10       MR. GONZÁLEZ VÉLEZ:  The jury, [period].

11       MR. MUÑOZ:  -- that -- that we cannot ask a

12 jury to enter into an extraordinary relief like the

13 one we are requesting.

14       I am being reminded once again that, if it

15 comes to that, Your Honor, if it comes to having to

16 waive the trial by jury in order to obtain today's

17 urgent remedy, our client has stated for the second

18 time that it's willing to waive trial by jury.

19       But, answering Your Honor's question, this

20 Court's jurisdiction emanates from 28 U.S. Code 1334

21 (e), which gives this Court exclusive jurisdiction

22 over property of the estate.        It also

23 emanates from 28 U.S. Code 1334 (b), which gives this

24 Court jurisdiction and it will remain in this Court

25 until and unless someone files for a withdrawal

reference, in which case the Court with the
jurisdiction over the matter at this stage in which
it is withdrawn will be the U.S. District Court.

So, the only problem posed by the opposing
party not consenting to the trial by jury, the only
difference it will make in their case is that, if at
that point in time we are still claiming -- we are
still requesting trial by jury, then we will have to
decide to move the Court for a withdrawal reference
so that at the trial level this case will be dealt
with before the U.S. District Court.

But today's hearing is not before a jury.
So, today's hearing we don't have any problem -- we
should not have any problem with the lack of consent
to the trial by jury by the opposing party.

(Counsel for Debtors confer)

MR. MUÑOZ:  Okay, Your Honor, I must add to
the record that we are amending the complaint to
withdraw the claim for -- the request for trial by
jury.

So, it's no longer an issue before the
Court.

MR. MARINI:  May I respond?

THE COURT:  Yes, you may proceed.

MR. MARINI:  Again, Luís Marini for State

1   Insurance Fund.

2        Your Honor, Brother Counsel in his argument

3   favored the case law and the analysis that I'm

4   supporting.  Because, he stated at the beginning of

5   the arguments that the biggest asset of this case is

6   the cause of action that they have or the contract

7   that they have with my client.

8        And the only reason that cause of action is

9   an asset of the estate is pursuant to section 541

10  which invests any prepetition causes of action upon

11  the estate upon the filing of a bankruptcy.  And

12  section 541 is specifically excluded from Section 106

13  of the Bankruptcy Code as to the sections for which

14  immunity has been abrogated.

15       The sections that I cited from the

16  congressional intent and the analysis from Collier's

17  go to exactly this issue, which is to prevent a

18  Plaintiff from using Bankruptcy to present causes of

19  action that could have been filed prepetition against

20  the estate.

21       And that principle, Your Honor, of sovereign

22  immunity, I understand, applies in this -- in this

23  case and requires the dismissal of the complaint.

24       I cited a case from the Supreme Court, the

25  Katz case, and I agree that that case resolved a

1   substantial controversy as to 106.  But it is not the

2   issue that is before the Court today.

3        What it resolved was that, prior to that

4   case, there was a split of authority among the

5   circuits as to whether the limitations that we're

6   discussing now, that abrogation of the sovereign

7   immunity powers as to certain specific sections of

8   the Bankruptcy Code, whether that was constitutional

9   or not, and whether the States had in fact acquiesced

10  to having those sections abrogated from that defense.

11  That was it solely.

12       So, the Supreme Court found 106 to be

13  constitutional.  That is why I'm arguing that it

14  applies.  But it specifically excludes section 541

15  from the sections as to which a defense has been

16  abrogated, or waived for lack of a better word.  And

17  that is not what is before Your Honor today.

18       Now,  --

19       THE COURT:  Mr. Marini?

20       MR. MARINI:  Yes?

21       THE COURT:  Is there a valid contract

22  between the Debtor and the State Insurance Fund at

23  this time?

24       MR. MARINI:  Your Honor, that is another

25  threshold issue, and I will explain -- I will explain

1    why.

2             If I may -- may I respond to the remainder

3    of the arguments, or should I get into that -- that I

4    had two more -- two more points that I was going to

5    say to what Brother Counsel mentioned.

6             When is he mentioned the Ninth Circuit case

7    which goes into whether this is a violation of 362.

8    I think that case and that reasoning and that lineup

9    is that that it's just not applicable.  Because, for

10   funds to be property of the estate and be subject to

11   542, that they have to be undisputed, they have to be

12   a mature.  And that is not the case here -- in the

13   case, Your Honor.

14            In fact, the case -- the cases where there

15   is a contractual dispute, the situation that has to

16   arise for the funds to be part of the estate as

17   requiring either a final judgment or a stipulation

18   from the party.

19            THE COURT:  But is there a valid contract --

20            MR. MARINI:  Your Honor, I think there is

21   not a valid contract.

22            THE COURT:  -- between the Debtor and the

23   State Insurance Fund?

24            MR. MARINI:  I think there is --

25            THE COURT:  So, there is a valid contract?

1          MR. MARINI:  -- I think there is not a valid

2     contract for --

3          THE COURT:  Not a valid contract?

4          MR. MARINI:  -- not -- not a -- the

5     contract, I understand, is null and void.

6     Potentially null and void -- I'm going to -- I'm

7     going to be careful and rephrase the argument -- for

8     the following reason, Your Honor.

9          I say "Potentially" because I'm using

10    literally only the facts alleged in the complaint.  I

11    haven't taken any discovery on the merits.  But, in

12    the complaint, the plaintiff alleges that Medsci is

13    incorporated as a corporation and dedicated to -- and

14    I quote -- "Providing radiology services".  This is

15    from paragraph 8 of the complaint.

16         Now, Your Honor, the applicable law requires

17    anyone that's going to provide radiology service to

18    be a licensed physician.  That is black letter law,

19    20 LPRA Section 135 (b).           Now, we go to the

20    law of corporations, and the law of corporations of

21    Puerto Rico specifically states what type of entity

22    can provide professional services that require a

23    license, such as physicians.  In the law of

24    corporations of Puerto Rico, article 18 and so on,

25    state that the only type of entity that can provide

1  professional services is a professional service

2  corporation.  And it states the requirements to be a

3  professional service corporation.

4        Among them, all of the owners, all of the

5  principals, all of the shareholders must be licensed

6  in the profession that the corporation is providing

7  services, in this case, licensed physicians.

8        And I'm only taking the affidavits that they

9  filed.  I haven't taken any depositions.  It may very

10 well be that Mr. Edgardo Carlo and -- and his partner

11 are licensed physicians.  I do not know.  It does not

12 appear from the declaration.  It only says that they

13 are counselors at law.

14       Now, the issue with that, Your Honor, is

15 that they take the Puerto Rico Supreme Court cases --

16 there is a line of cases that, starting with a case

17 called Raza Engineering vs. Dubón, case 86 DPR 193, a

18 subsequent decision made in Regio de Ingenieros (sic)

19 vs Autoridad de Acueductos y Alcantarrillados, 131

20 DPR 735, and, in that line of questioning, are --

21 that -- those -- those cases articulate that you

22 cannot have a valid contract when the corporation

23 that is providing the professional services is not

24 authorized to do so.

25       In those cases, in one of them, it was a

1    corporation that was providing engineering services,

2    and some of the owners were not licensed engineers.

3    That was in question.  And the Supreme Court said if

4    that were the case, the contract is null and void.

5    And it remanded to find out whether in fact that was

6    the case at the trial court level.

7              If, Your Honor, the owners of these

8    corporations are not licensed physicians as required

9    by law, the contract is null and void, and it isn't

10   in existence.

11             Now, I mentioned that I had a number of

12   special issues at the beginning.  I haven't gotten

13   into the merits, but those are the three, I think,

14   threshold jurisdictional issues: one is my client is

15   not waiving the right to a jury trial; the time to

16   answer the complaint has not expired; --

17             THE COURT:  Do you think there is a right to

18   jury trial?

19             MR. MARINI:  I think there is a right to

20   jury trial, yes.

21             THE COURT:  Why?

22             MR. MARINI:  Your Honor, because we haven't

23   -- well, I need to preserve the right to a jury

24   trial, Your Honor.

25             THE COURT:  Is this a cause of action that

1  would have been heard before a jury in state court?

2          MR. MARINI: Your Honor, I -- it -- well, I

3  think it could be heard in the District Court. No, I

4  need to preserve the right. Because, to be candid, I

5  need to look at that issue. But I think there is a

6  right, a potential right to a jury trial.

7  Particularly, there are counterclaims filed by my

8  client.

9          And I cannot, at this stage, Your Honor,

10 responsibly waive that right at a preliminary

11 hearing. And the right exists, and it is

12 articulated.

13         What I -- what I can state to the Court,

14 because I have consulted with my client, is that

15 they're not going to consent to a trial by jury in

16 the Bankruptcy Court and that they're going to

17 withdraw the reference.

18         And, Your Honor, the other special issue

19 that I mentioned is the sovereign immunity that I

20 think applies and requires a dismissal of the

21 complaint.

22         And, third, that, if the contract is null

23 and void, there's no injunction for specific

24 performance, there's no motion to turn over if there

25 is no contract to enforce.

36

1       And those three issues, Your Honor, before

2  we get into a full-day evidentiary hearing, hearing

3  witnesses as to the merits of a cause of action that

4  may not exist or may not be right for adjudication in

5  this Court, I think those three issues should be

6  resolved.

7       MR. GONZÁLEZ VÉLEZ:  Your Honor?

8       THE COURT:  Well, there is a contract until

9  it is declared null and void.

10       MR. MARINI:  I understand.

11       THE COURT:  Does that contract give

12  exclusive rights in certain regions to the Plaintiff?

13

14       MR. MARINI:  Your Honor, I think the way

15  they have raised the argument is misplaced.

16       What the contract -- my understanding of the

17  contract, from reading it, is that what it provides

18  is a right to provide referrals, in the first

19  instance, to the Debtor in three regions, but there

20  are specific exclusions, Your Honor.

21       There are exclusions as to that obligation -

22  - Your Honor, I don't want to speak from memory.  So,

23  if the Court will allow me a few seconds, I want to

24  get the contract.

25       (Documents are reviewed)

1          Now, there are specific inclusions --

2    inclusions to that obligation, assuming the contract

3    is in existence, to provide referrals that include

4    whether the equipment required to provide the

5    services is available, whether there is the personnel

6    necessary to conduct the tests, or where the volume

7    of patients is larger than the capacity of Medsci.

8          Your Honor, if the Court were to hear

9    evidence today -- and I don't think the Court should

10   get into the merits for the reasons that I have

11   articulated -- but, if the Court were to hear

12   evidence today, what might -- what I understand what

13   evidence is going to show is that my client has

14   complied with those obligations, Your Honor, has

15   complied with the clear language of the agreement.

16         Because, Your Honor, this is a contractual

17   dispute, and the terms are clear.  Whatever the

18   Plaintiff can allege as to what was represented prior

19   to executing the contract, that is irrelevant.

20   Plaintiffs has -- their owners are two very well-

21   known and respected counselors.  This was a contract

22   between sophisticated parties, and it is clear.  And,

23   when you look at the terms of the contract, the

24   evidence will show that my client complied with the

25   referrals, that my client complied with the clause

1  requiring payment of invoices.

2          Because, contrary to what they allege, Your

3  Honor, in the complaint and in the motion, it doesn't

4  require invoices to be paid within 30 days.

5          THE COURT:  Let me see if I understand your

6  argument.          MR. MARINI:  Yes.

7          THE COURT:  First, you state that the

8  contract may be null and void.  But,  assuming it is

9  not, it is your position that the State Insurance

10  Fund has complied with the terms of the contract, has

11  not violated the referral clause, and has paid all

12  the invoices --

13          MR. MARINI:  Correct that.

14          THE COURT:  -- and is current?

15          MR. MARINI:  And is current as per the terms

16  of the contract.

17          THE COURT:  As per the terms of the

18  contract?

19          MR. MARINI:  Correct, Your Honor.

20          That was my -- my -- that is -- and that is

21  what the evidence will show if the Court gets into

22  the merits, but I think it shouldn't for the other

23  reasons that I have articulated.

24          That -- and I -- to expand, Your Honor, to

25  be clear, I think what it would show is that they

have paid in accordance with the contract but the
contract does not require a specific timeperiod for
payment.  It states only that you're going to pay
within a short amount of time or promptly -- I'll
look at the words -- in accordance with the
applicable laws, regulations of the State Insurance
Fund and of the Commonwealth of Puerto Rico.

       And what the evidence will show is the
levels of review that are required before a payment
is made.  Because, Your Honor, we're talking about
public funds.  These are -- these are funds from the
Commonwealth of Puerto Rico, and that requires a
level of review.  And my client has complied with
those applicable laws, applicable provisions, and
paid as required by the contract.

       If the Court were to get into the merits,
what would find is that, if it were to adjudicate the
merits of the dispute today, the Court would be
adjudicating the merits of the contractual dispute.
Because, my client is going to present evidence that
it's going to -- apparently completely contradictory
to what they're saying -- they're going to present
evidence that they are complying with the contract --
and, if the Court were to get into the merits, it
would be, in essence, close to an adjudication of the

1  merits.

2          Because, that's what we're arguing, Your

3  Honor.  The trial that  we would have today or the

4  evidentiary hearing wouldn't be much different from

5  the trial we would have on the merits after

6  discovery, except that, at this stage, my client has

7  taken no discovery, my client has not renounced the

8  right to a jury trial, and there are jurisdictional

9  issues that haven't been raised -- addressed.

10         MR. GONZÁLEZ VÉLEZ:  May -- may I?  Just

11  very short.

12         THE COURT:  Yes.

13         MR. GONZÁLEZ VÉLEZ:  From what I -- I am not

14  capable, me, of playing in the league of these two

15  prior attorneys discussing the merits of the

16  bankruptcy law because of the fine points that they

17  have discussed.

18         So, I'm not -- I'm just going to answer, as

19  far as law is concerned, two very superficial matters

20  and then the compressable (sic) facts.

21         Number one, even if -- even if sovereign

22  immunity applied to the Fund, to the State Insurance

23  Fund, injunction is not limited by the sovereign

24  immunity.  The sovereign immunity goes to determining

25  amounts of funds owed pursuant to local law by the

1  local government.  And that is a very specific and
2  limited immunity.  It is not for everything.
3          Courts, federal courts, issue injunctions in
4  regard to an order for cease and desist against state
5  officials, not to the corporations -- it's one of the
6  issues, whether they do qualify for the sovereign
7  immunity as a corporation -- it's another issue --
8  but, even assuming for the purposes of this specific
9  argument that they -- that it does apply, it does not
10  apply to an order to cease and desist.
11          And this is -- essentially, that's why I
12  expressed our request in the positive and the
13  negative manner.  Because, what they are doing is
14  acting illegally against their own prior
15  representations and agreements, and that can be
16  stopped.
17          Now, if they want to refer to pay, if they
18  jurity (sic), and -- and they know -- and the
19  jurisprudence has already solved this type of issues.
20  It's called the inland reserve.  If the Court should
21  decide -- which I'm sure it will not -- but, assuming
22  it would decide on, after, I presume, briefs, etc.,
23  that the eventual trial of the damages, which are
24  also claimed in the complaint, should go to the state
25  court, that does not mean that the Plaintiff here

 1  would have to renounce to those rights that it has
 2  that -- by federal court.
 3          And, certainly, bankruptcy is federal law,
 4  and it's -- I'm sorry -- and it's -- we would not be
 5  renouncing to the injunctive power of this Court to
 6  provide us the interim relief until the damages on
 7  its day if they were found.
 8          THE COURT:  Okay.  In that line, injunctive
 9  relief is generally to preserve the status quo.
10  Okay?  You don't want to preserve the status quo,
11  because the status quo is that, according to your
12  allegations, payments of invoices are not timely
13  made, and the State Insurance Fund is not complying
14  with the contract.
15          MR. GONZÁLEZ VÉLEZ:  Well, in that --
16          THE COURT:  So, I want specific --
17          MR. GONZÁLEZ VÉLEZ:  Okay.  Your Honor, as
18  Brother Counsel has previously mentioned, the status
19  quo we want to preserve is survival of this company.
20  And we want the compliance -- the status quo is a
21  compliance with the contract.
22          Normally, status quos that are to be
23  preserved but are not status quos against the law:
24  it's status quo inside the law.  The law is at the
25  heart of equity, and it's the -- that's one of the --

43

1          THE COURT:  Okay.  What evidence do you have

2  -- I guess what you need now is, well, (1) money to

3  file operations, (2) compliance with the contract so

4  that you have the income to meet expenses.

5          MR. GONZÁLEZ VÉLEZ:  That -- that -- that

6  summarizes it briefly.

7          THE COURT:  But, ultimately, that would be

8  the trial.          MR. GONZÁLEZ VÉLEZ:  Yes.

9          THE COURT:  But, at this time -- at this

10  time and this juncture -- assuming that you prevail,

11  since it's an interim remedy, it will be just for the

12  amount needed to preserve the estate, assuming that

13  you have the right to it, before a final decision.

14          So, --

15          MR. GONZÁLEZ VÉLEZ:  But we -- we would

16  understand that --

17          THE COURT:  -- so, what evidence would you

18  present to the Court as to what is needed by the

19  Debtor on an immediate and urgent basis and that the

20  State Insurance Fund has in order to keep the

21  corporation alive?

22          MR. GONZÁLEZ VÉLEZ:  Well, we would need --

23  they --

24          THE COURT:  What will you show?

25          MR. GONZÁLEZ VÉLEZ:  Well, we will show that

1   the actual amount of patients, the actual amount of

2   patience is or should be close to the amounts we

3   claim.  We would show

4   that --

5              THE COURT:  What evidence do you have --

6              MR. GONZÁLEZ VÉLEZ:  Yes, sir.

7              THE COURT:  -- that the State Insurance Fund

8   has violated the terms of the contract?

9              MR. GONZÁLEZ VÉLEZ:  The very fact that the

10  number of clients of patients differs substantially

11  from what is a known fact of a repeatable number of

12  patients in the regions at hand.

13             That fact by itself produces -- the amount

14  or the size of the discrepancy between the known

15  number of clients or patients and the referred number

16  of patients is such that it can only be taking place

17  if the patients are being referred to outside

18  suppliers.

19             In fact, we just, this morning, produced --

20  we could not produce the witness -- sadly, it's not -

21  - he's not available there, we cannot subpoena the

22  person -- but we -- this morning, we did obtain a

23  statement under penalty which we supplied by one of

24  the offices.  It's been ordered to refer them as

25  suppliers.

1          THE COURT:  Okay.  What evidence do you have

2     that the State Insurance Fund has not paid invoices

3     that were validly submitted?

4          MR. GONZÁLEZ VÉLEZ:  Well, we have -- No. 1

5     is the testimony of Doña Mónica who will -- this is

6     not my book, I'm sorry -- this is --

7          (Documents are reviewed)

8          MR. GONZÁLEZ VÉLEZ:  We have the testimony,

9     Your Honor, of Doña Mónica Vizcarrondo.  We have the

10    testimony of Don Eduardo González Glin which is the

11    Auditor which will provide the evidence of what is

12    actually being referred to in the billings.  And

13    Counsel Velone will of course -- and we can also seat

14    Don Eduardo Carlo.

15         Don Roberto Reyes Pérez and Don Carlos Ruíz,

16    who were high executives -- one of them, of course,

17    was the administrator of the State Insurance Fund

18    when this contract was signed -- will explain to you

19    what our numbers and reasonable expectations of

20    numbers and why we say that the difference between

21    our expectations and what we receive will constitute

22    -- will result in only -- in only one reasonable

23    inference.  It is inference, because we have not yet,

24    at this stage of the game -- we also need discovery

25    to find out who received those referrals that should

1  have gone to Medsci.

2          But the discrepancy is so great that it can

3  only take place if the patients are being referred

4  somewhere else.  And that will be testified to by

5  these witnesses that are offered at this stage.

6          There was something else I wanted to bring

7  up -- please excuse -- also, Your Honor, I notice

8  that Brother Counsel has not said that he doesn't --

9  that the State Insurance Fund doesn't owe the amount.

10 He has very carefully stepped around the tulips but

11 has not stated clearly "We don't owe that amount" --

12 He hasn't said that -- the $860,000 or so over --

13 over 60 days that are owed.

14         He has said that they have to pay it swiftly

15 -- or some other word, which is more or less an

16 adequate translation -- but he has not explained why

17 our demand that it be paid in 60 days is not a

18 reasonable swift payment or -- or if they --

19         THE COURT:  According to the contract,

20 payment has to be made within what period of time?

21         MR. MUÑOZ:  It's not stated.

22         MR. GONZÁLEZ VÉLEZ:  Not stated, but as soon

23 as possible.  And that was understood to be within 60

24 days.

25         I mean, again, this is the sort of thing

1    that it was in the same spirit as the paying of the
2    $11 million or $12 million.  If they had taken 75
3    days, we would not be here.  It is because there's
4    amounts of money owed over 150 days.  And that, when
5    -- the law in Puerto Rico, as Your Honor knows, is
6    when no specific times, etc., like this situation,
7    are provided, it doesn't mean that it's in the hands
8    of one party or another to determine the
9    reasonability.  And it is unreasonable to have to
10   wait five or six months for the payment of a service
11   provided.

12           And that was not the representation made, as
13   we will also prove.  And we do have those witnesses
14   to show that.

15           Oh, one final thing, Your Honor: the
16   standard rules for injunction is that the probability
17   of who will prevail, besides who's suffering what
18   damage, are two essential criteria for issuing and
19   measuring the injunction -- the relief that will be
20   granted.

21           So, the argument of Brother Counsel that, if
22   you are listening to this evidence, you are going to
23   be prejudging the case, it is to a certain degree.
24   It's not complete, because we will have other
25   witnesses.  We also will make discovery so as they

48

1    will.

2          But this, Your Honor, will have to -- if --

3    if it decides to go on, we'll have to listen to

4    evidence as to what was the contract and who is

5    apparently complying or not with the terms of the

6    contract and who's suffering what damage.

7          And, in that sense, it is a precursor or a

8    prelude to the trial on its merits, but that's

9    standard injunction practice.

10          THE COURT:  I am not going to decide the

11    complaint today.

12          Assuming that you prevail, how much is

13    needed for what period of time, and where are the

14    funds going to come from?

15          MR. GONZÁLEZ VÉLEZ:  At this stage, we

16    figure that we need about $700,000 out of the 800 or

17    of those 900 that's outstanding.

18          THE COURT:  Okay.  That's a conclusion.

19          How do you reach that conclusion?

20          MR. GONZÁLEZ VÉLEZ:  Well, we have an aging

21    system that determines -- you mean, for the amount

22    needed or -- or for how much we need?  Or for how

23    much is outstanding?  I'm sorry.  I didn't

24    understand.

25          THE COURT:  I said I am not going to decide

49

1   the merits of the complaint today.

2           MR. GONZÁLEZ VÉLEZ:  Yeah, I understand.

3           THE COURT:  I will only provide an interim

4   relief to prevent immediate and irreparable damage to

5   the estate.

6           MR. GONZÁLEZ VÉLEZ:  Brother Counsel --

7   Counsel Velone, but, let's say, the principal, says -

8   - tells me that he -- it will be part of his

9   testimony as to what exactly he needs and why.  And

10   we can provide that.

11          And the reasons why, essentially, the

12   obligation to pay the post-financial and the

13   maintenance of the equipment, Your Honor.  Right now,

14   we are not able to pay adequately the maintenance of

15   the equipment.  And that has been a source of

16   contention with SIF.

17          THE COURT:  Okay.  Do any -- what are the --

18          MR. GONZÁLEZ VÉLEZ:  Yes?

19          THE COURT:  -- laws governing accountability

20   of the government of Puerto Rico?

21          MR. MARINI:  Your Honor, that would be part

22   of the evidence if it were to be presented.  We -- we

23   believe --

24          THE COURT:  And -- and the -- are there any

25   --

1          MR. MARINI:  -- the regulations --

2          THE COURT:  -- written applicable procedures

3    --

4          MR. MARINI:  Yes.

5          THE COURT:  -- as to how the invoices are

6    processed?

7          MR. MARINI:  Absolutely, Your Honor.

8          THE COURT:  Because, that's what the

9    contract --

10         MR. MARINI:  Absolutely, Your Honor.

11         THE COURT:  -- provides for.  I just --

12         MR. MARINI:  I -- I agree.  And I was going

13   to read that part.

14         THE COURT:  And your position is that you're

15   complying with the law regarding accountability and

16   applicable regulations?

17         MR. MARINI:  Correct, Your Honor.  That

18   would be the testimony.

19         THE COURT:  And you have them?

20         MR. MARINI:  That would be the testimony of

21   my witness.

22         THE COURT:  Because, I don't know what they

23   are.

24         MR. MARINI:  Yes.  Your Honor, it requires -

25   - and I don't intend to be an expert on it -- but it

1   requires a multilevel review from different sectors

2   of the government before public funds are sent out.

3          And the argument that Brother Counsel made -

4   -

5          THE COURT:  Okay.

6          MR. MARINI:  -- that the contract requires

7   prompt is inaccurate.  It's incomplete is the right

8   word.  Because, it's not that it requires prompt

9   payment; it's that it requires prompt payment after

10   that process has been concluded.

11          As to the substantial majority -- I say

12   substantial, Your Honor, because -- and I'll explain

13   that in the second -- but, as to the substantial

14   majority of what they're claiming, that process has

15   not been completed.

16          And, if the Court were to issue an order

17   today requiring my client to pay money, it would be

18   providing them remedies that they aren't entitled --

19          THE COURT:  I will not order the State

20   Insurance Fund to violate law or applicable

21   regulations.

22          MR. MARINI:  Then, Your Honor, if that were

23   the case, to be perfectly candid, any -- any order

24   requiring my client to pay money --

25          THE COURT:  However, if there are amounts

1  owed pursuant to a valid contract that have not been

2  paid, --

3              MR. MARINI:  Yes.  That -- that I can --

4              THE COURT:  -- that's a different.

5              MR. MARINI:  -- I can -- I can articulate

6  that, Your Honor.

7              There are only -- as I mentioned before, my

8  client's position and what the evidence will show is

9  that they have complied and are complying with the

10 agreement.  They will show that they have been paying

11 and they are -- and they have continued analyzing the

12 invoices.

13             As of today, there are about $100,000 that

14 have completed that review and which my client would

15 be available -- would be able to pay.  That is --

16 that is the extent of the amounts that have been

17 requested that have been reviewed in accordance to

18 law and can be paid pursuant to law and the --

19             THE COURT:  And, generally, how much -- how

20 long does it take to process an invoice, on the

21 average?

22             MR. MARINI:  May I take a second, Your

23 Honor?

24     (Counsel confers)

25             MR. MARINI:  If I may?  My partner who knows

53

1   the process better is going to address that.

2           THE COURT:  Yes?

3           MR. MUÑIZ:  Well, Your Honor, attorney

4   Mauricio Muñiz for the State Insurance Fund.

5           As we get to the evidence this afternoon,

6   what we have here is a witness, Rose Mary de Alarcón,

7   who's from the accounting department and who will

8   actually take the Court through the process of the

9   internal regulations.  It's a published regulation of

10  the State Department which enumerates the steps and

11  the levels in the life cycle of --

12          THE COURT:  Do you have a citation for that

13  regulation, where it can be found?  Or --

14          MR. MUÑIZ:  I have a copy for the Court that

15  may -- it's in Spanish, but --

16          THE COURT:  That's fine.

17      (Documents are reviewed)

18          MR. GONZÁLEZ VÉLEZ:  Is there a copy for the

19  Plaintiff as well?

20      (Documents are reviewed)

21          THE COURT:  And what's of the citation to

22  the -- to the law, not to the regulation?  It can be

23  found where?

24          MR. MUÑIZ:  To the law?

25          THE COURT:  "Ley de contabilidad del

54

1   gobierno de Puerto Rico".

2       (Documents are reviewed)

3           MR. MUÑIZ:  This is the internal policy

4   that's being followed by the SIF.

5           THE COURT:  Okay.

6           MR. MUÑIZ:  And, Your Honor, as -- as we

7   will show through the evidence, and as this document

8   shows, the process is that, say, the life cycle of

9   the invoice is, once the service is rendered, the

10  provider, in this case, Medsci, has to fill out

11  several paperwork and prepare appropriately an

12  invoice.

13          And, once it's submitted to the SIF, say,

14  for example, in this case, the service is provided to

15  -- in Mayagüez -- so, the three regions in question

16  are Mayagüez, Ponce, and Carolina -- the invoice for

17  that specific service needs to be submitted to the

18  specific region where the service was provided.

19          And then, the acting -- the medical director

20  of that -- of the different regions has to certify

21  invoice by invoice that the service was provided.

22          THE COURT:  But what's an estimate of the --

23          MR. MUÑIZ:  About three months.  Three to

24  four months.

25          THE COURT:  90 days?  From 90 to 120 days?

CERTIFIED TRANSCRIBERS, INC.
1075 Carr. 2 Plaza Suchville #302
Bayamón, Puerto Rico 00959
Tel. # (787) 783-6623; (787) 617-9487

55

1        MR. MUÑIZ:  Once it receives the invoice,
2   yes.

3        You can say 90, Your Honor.  And that's once
4   the invoice is received.  Because, as the evidence
5   will show, for example, invoices for services
6   rendered, for example, Medsci rendered some services
7   in January, it took them -- it took them about 45
8   days to actually submit the invoice to the State
9   Insurance Fund.

10       THE COURT:  And what is the citation to the
11   accounting law of Puerto Rico?

12       MR. MUÑIZ:  I don't have it here with me,
13   Your Honor, but I will find out.

14       You're saying the "Ley de contabilidad del
15   gobierno"?           THE COURT:  Yes.  The accounting
16   law, yes.

17       MR. MUÑIZ:  Okay.  I will find that.  I
18   don't have the exact citation.

19       THE COURT:  Okay.  Then, thank you.

20       Of the three threshold issues that we have
21   mentioned, one is the issue of the jury trial, that
22   has been withdrawn, so that's not an issue.

23       MR. MARINI:  No, it's not -- it's not an
24   issue, Your Honor.

25       THE COURT:  It's not an issue.

CERTIFIED TRANSCRIBERS, INC.
1075 Carr. 2 Plaza Suchville #302
Bayamón, Puerto Rico 00959
Tel. # (787) 783-6623; (787) 617-9487

1          MR. MARINI:  To the extent that I have --
2    that I have a right --
3          THE COURT:  It may become an issue if you
4    claim it and then we establish that there is a right
5    to a jury trial.
6          On the issue of whether the contract is null
7    and void, as of this moment, there is a valid
8    contract, until it's declared null and void.  We
9    cannot assume that it's small and void.
10          MR. MARINI:  Your Honor, --
11          THE COURT:  I am assuming -- what I am
12    assuming is that it was an arms-length transaction
13    between the parties and that the contract was drawn
14    and it has been ongoing for a couple of years, three
15    or four years -- two or three years, I guess.
16          The only pending issue would be whether or
17    not the State Insurance Fund is immune from this --
18    from this suit.  And I'll -- I'll look closer to
19    that.  I am under the impression that, under the
20    recent decisions of Katz and Hood, there may be
21    jurisdictional authority of this Court to entertain
22    this action, maybe not so before those positions.
23    But I'll look at that closer, and I'll announce that
24    after we convene this afternoon at 1:45.
25          MR. MARINI:  Could I mention something, Your

1    Honor?  I understand the Court is --

2          THE COURT:  But be ready to present the

3    evidence at 1:45, assuming that I may find that the

4    State Insurance Fund is not, in this action,

5    protected under sovereign immunity.

6          MR. MARINI:  Okay.  Can I make just one

7    point?  And I understand the Court's position.

8          The only point that I would make is that the

9    argument as to null and void is really a legal -- a

10   legal argument, to the extent that the owners are not

11   licensed physicians is a matter that I can submit to

12   the Court and the Court can make a legal

13   determination.

14         THE COURT:  But, let -- let's assume they

15   are not licensed physicians -- which I think that

16   could be

17   stipulated --

18         MR. GONZÁLEZ VÉLEZ:  Yes.  Yes.

19         THE COURT:  -- I don't think they are

20   licensed physicians -- does that make -- and they

21   are, because it's been declared in the petition they

22   are the principals of the corporation -- so, does

23   that mean that the contract is null and void?

24         MR. MARINI:  Your Honor, I think that is the

25   case pursuant to the Supreme Court cases that I --

1   that I explained before to the --

2          THE COURT:  But isn't it the case that

3   whoever provides the services, the reading of the X-

4   rays, has to be a licensed physician, not the owner?

5          MR. MARINI:  I -- my understanding of the

6   cases is that the corporation that is engaged in the

7   contract to provide the services, that if that is the

8   case that you're going to have a corporation or an

9   entity signing a contract to provide services which

10  require a license -- in that case, it was engineering

11  -- that the owners need to have a license or the

12  contract is null and void.

13         It's not only in those cases, it's also in

14  the law of corporations.  If you're going to be an

15  entity to engage in providing medical services, it

16  has to be a professional services corporation, and

17  its owners must be licensed physicians.  Its article

18  1802, 1805, and 1808 of the law of corporations.

19         MR. GONZÁLEZ VÉLEZ:  May I?

20         THE COURT:  Yes.

21         MR. GONZÁLEZ VÉLEZ:  It's just two things.

22  The first one which I want to ask: I understood that

23  Brother Counsel said that 90 days was more

24  representative of what the time should be for the --

25  for the paying of the -- if that is correct, I would

1    like to know, because there is an outstanding amount,

2    which would be less than what we have claimed that as

3    outstanding and property of the estate today, but

4    that could take care of part of our controversies.

5            Number two, Your Honor, there's an estoppel

6    here involved.  State Insurance Fund at all times

7    knew who the owners of the corporation were, what

8    they were, what they were not, and they were invited

9    to this to provide this, the services and the

10   equipment, and, of course, they do not provide direct

11   services: the doctors do.

12           And -- but, there's an important thing that

13   comes of to my mind, and it's: do all owners of stock

14   in hospitals and corporations involved in any way in

15   providing medical or medical-related services have to

16   be doctors or authorized --

17           THE COURT:  Are you asking me?

18           MR. GONZÁLEZ VÉLEZ:  -- I -- I don't think

19   so.

20           THE COURT:  Are you asking me?  I don't

21   know.  You show me --

22           MR. GONZÁLEZ VÉLEZ:  Okay.  Well, Yeah,

23   Yeah.

24           THE COURT:  -- whether or not this is a

25   valid corporation.

1          MR. GONZÁLEZ VÉLEZ:  I -- I've gone it.
2  I've got it.  But I -- I do -- I -- I think he has to
3  prove that, that it's a requirement, because he has
4  negotiated and -- and --
5          THE COURT:  Give me the citations and the
6  case law.
7          MR. MARINI:  I will, Your Honor.
8      (Documents are reviewed)
9          MR. GONZÁLEZ VÉLEZ:  Oh, finally, Your
10 Honor, yes, we are going to start showing evidence at
11 2:00 if -- if -- or 1:45 is the time that the Court
12 is actually --
13         THE COURT:  It's going to be two hours after
14 we finish in the morning.
15         MR. MARINI:  The citations: the law
16 requiring that that someone engaged in this type of
17 practice and have a license is 20 LPRA Section 135
18 (d).
19         The law of corporations requiring that
20 entities engaged in professional services be a
21 professional service corporation is article 18 of the
22 law of corporations.  I'm missing the first citation.
23 But it's the law of corporations, article 18, part --
24 and specifically article 1802 defines what is a
25 professional service corporation and to what type of

1    services it applies, including medicine.

2          Article 1808 -- article 1808 states that any

3    owners of that entity must be a licensed -- in this

4    case -- physician.

5          The citation, Your Honor, -- my colleague

6    just gave it to me -- is [Law No. 164, December 16,

7    2009].

8          And the article I just mentioned as to the

9    owners is an article 1802.

10         THE COURT:  Well, is that the 2009 law?  But

11   this is a --

12         MR. MARINI:  Maybe -- Your Honor, and if

13   it's --

14         THE COURT:  -- a 2007 contract.

15         UNIDENTIFIED INDIVIDUAL:  (Off mic)  Your

16   Honor, if it was amended, whether or not the same

17   requirement was (Off mic)  --

18         MR. MARINI:  Alright.  Let me give him the

19   recent one, but I think it existed before.

20      (Documents are reviewed)

21         MR. MARINI:  No, Your Honor, let me -- the

22   case law that I -- the case law that I mentioned, the

23   two cases, one of them is -- let me make sure that I

24   have the correct citation -- the "Colegio de

25   Ingenieros y Agrimensores de Puerto Rico vs.

1   Autoridad de Acueductos y Alcantarrillados", 131 DPR

2   735.  It is a 1992 decision of the Supreme Court.

3         The second case is Raza Engineering Corp.

4   vs. Horacio Daubón, citation 86 DPR 193.  And it is a

5   decision of the Supreme Court of 1962.

6         MR. MUÑOZ:  Excuse me?  86 DPR?

7         MR. MARINI:  86 DPR 193.

8         MR. MUÑOZ:  Okay.

9         MR. GONZÁLEZ VÉLEZ:  If that is -- and, if

10  he's not there on the cases, we would respectfully

11  request that the Court withhold ajudging this subject

12  until we have an opportunity to check this matter,

13  because it's new for us.  I mean, we didn't expect

14  this --

15        THE COURT:  Well, it's new for me -- it's

16  new for me too.  I'm going to check it at noon.

17        MR. GONZÁLEZ VÉLEZ:  Okay.

18        MR. MARINI:  And, Your Honor, the only --

19  the only response that I would make is that estoppel

20  doesn't apply --

21        THE COURT:  If I don't -- if I don't hear

22  this today, it will probably take me at least three

23  more weeks before we can reconvene.

24        MR. GONZÁLEZ VÉLEZ:  But we will be --

25        THE COURT:  So, I have to finish this today.

1    I mean, if you don't need a quick decision --

2          MR. GONZÁLEZ VÉLEZ:  No, no, no, no.  No,

3    no.

4          THE COURT:  -- in favor or against, that's

5    fine.

6          MR. GONZÁLEZ VÉLEZ:  No, I just meant that

7    not -- ajudge this matter in the morning.

8          THE COURT:  Okay.

9          MR. GONZÁLEZ VÉLEZ:  We will read it during

10   the noon time.

11         THE COURT:  I cannot -- I cannot make a

12   decision, because I don't know, I haven't read the

13   section.  So, I think it would be irresponsible on my

14   part to -- to just give you my impression.  I may be

15   wrong or right, but I have to read them first.

16         MR. GONZÁLEZ VÉLEZ:  I -- I understand.  All

17   I meant is that we would like to answer in the

18   afternoon after ruling the case if that's okay.

19         THE COURT:  So, at two o'clock.  The court

20   recesses until two o'clock.

21         MR. MARINI:  Thank you.

22      (Hearing in this matter is to continue into

23   afternoon session at 2:00 p.m.)

24                            (11:58 a.m.)

25

1

2

3

4

5

6                        <u>AFTERNOON SESSION</u>

7                                          (3:29 p.m.)

8          COURTROOM CLERK:  (Calling case)

9          THE COURT:  Before hearing from the parties,

10   let me make the following disclosure.

11          The attorneys for the parties and the Court

12   have been meeting in chambers, and I advanced to the

13   parties that I would be issuing two Bench decisions.

14   One, I will find that section 106, which is a waiver

15   of sovereign immunity, will apply in this case, and I

16   will deny without prejudice the request to declare

17   the contract small and void.

18          The third issue was the issue of the jury

19   trial.  Since the complaint will be amended or

20   Plaintiffs will indicate that they are no longer

21   requesting a jury trial at this juncture, there is

22   not an issue.  But, whether or not there is a right

23   to jury trial or whether or not this Court has the

24   power to hear an adversary proceeding or if there is

25   a right to jury trial without the consent of all

1  parties.

2          Those were the three issues.  In addition,

3  subject, and because of those decisions, the parties

4  have engaged in an en rem negotiations of the interim

5  remedy.  But those, I will -- I will have the parties

6  proffer to the Court.

7          First, as to the decisions on the pending

8  motions, upon the issue of sovereign immunity, I find

9  the same is, in this case, is waived under section

10  106 of the Bankruptcy Code, and I will explain why.

11          First, Section 541 (a) of the Bankruptcy

12  Code determines that the commencement of a case

13  creates an estate over all legal or equitable

14  interests of the Debtor.

15          Section 28 USC 1334 (e) grants jurisdiction

16  to bankruptcy courts over property of the estate.

17          Section 157 (a) of Title 28 provides that

18  the District Court refers cases to the Bankruptcy

19  Court -- excuse me -- arising in, under, or related

20  to bankruptcy petitions.  In this district, there is

21  an order of referral of all cases.

22          Now, the contract that the Debtor has with

23  the State Insurance Fund and the accounts receivable

24  therefrom are Debtor's principal assets and source of

25  income.

CERTIFIED TRANSCRIBERS, INC.
1075 Carr. 2 Plaza Suchville #302
Bayamón, Puerto Rico 00959
Tel. # (787) 783-6623; (787) 617-9487

1          With that basis, then we go to the action
2    which is before the Court.  And I'm specifying: I'm
3    using 541 for the purpose of establishing what is
4    property of the estate, and, later, the relevance of
5    this will become apparent in the application of the
6    waiver of sovereign immunity over actions -- over en
7    rem actions in reference.  So, I'm using 541 only for
8    the purpose of establishing that this is an en rem
9    proceeding.

10         Actually, the section under which the Debtor
11   has filed a -- or, one of the sections is Section
12   542, which governs the turnover of property.  And, an
13   action over the turnover of property under 11 USC 542
14   (a) is a core proceeding pursuant to 28 USC 157 (b)
15   (2) (e).

16         The Defendants have brought or presented to
17   the Court or alleged that a District Court case
18   decides that the State Insurance Fund is entitled to
19   sovereign immunity.  I have read the case of Berríos
20   Trinidad vs. Ruíz Nazario.  I found it in Westlaw,
21   and it's 2009 Westlaw 866 864 District of Puerto
22   Rico, Judge Pieras' decision of March 27, 2009,
23   concluding that the State Insurance Fund, as an arm
24   of the State, is entitled to sovereign immunity.

25         At this time, I will follow the decision of

1  Judge Pieras in determining that the State Insurance

2  Fund is entitled to sovereign immunity

3         However, in Bankruptcy, there is a slight

4  difference.  There is a specific section, which is

5  Section 106, entitled "Waiver of sovereign immunity".

6  There are two leading cases or recent cases -- well,

7  recent is 2004-2006 -- which have expanded and

8  interpreted Section 106 of the Bankruptcy Code.

9         The first case is Tennessee Student

10 Assistance Corp. vs. Hood (sic), 124 Supreme Court

11 1905, 541 U.S. 440, 2004, which rules that generally

12 when a Bankruptcy Court exercises its en rem

13 jurisdiction, it does not infringe State sovereignty.

14

15        The second case is Central Virginia

16 Community College vs. Katz, 126 Supreme Court 990,

17 546 U.S. 356, 2006.  This case held that, by

18 ratifying the Bankruptcy clause, that is, article

19 one, Section 8, clause 4, in the United States

20 Constitution, the States acquiesced to subordinate

21 sovereign immunity in proceedings necessary to

22 effectuate en rem jurisdiction of Bankruptcy Courts.

23        Having found that this is an en rem

24 proceeding, because it's a proceeding to preserve the

25 main asset of the estate, I am finding that there is

1    a waiver of sovereign immunity.

2         I did read the site to Collier's which

3    attorney Martini indicated at paragraph 106.04,

4    specifically pages 106.20 and 21.  And, indeed, the

5    Collier's treatise cites or states that Congress --

6    excuse me -- Congress excluded, however, Section 541

7    from the abrogation list, as a result of which

8    government Defendants, absent a waiver, are still

9    permitted to assert sovereign immunity in proceedings

10   brought by the estate to enforce a prepetition cause

11   of action.

12        Congress apparently did not want to allow

13   the happenstance of a Debtor's Bankruptcy to permit

14   the estate to obtain a recovery against a

15   governmental unit that would not have otherwise have

16   been available outside of Bankruptcy because of

17   sovereign immunity.

18        However, there's a second paragraph, which

19   states Section 106 (a) does include Section 542 and

20   of the provisions for which sovereign immunity is

21   abrogated.  This inclusion prevents a government unit

22   from frustrating efforts to consolidate estate

23   property in the Bankruptcy Court by holding onto it

24   and asserting sovereign immunity as a shield against

25   suit.

1        Section 542, however, also provides that an
2   entity that owes a debt that is a property of the
3   estate shall pay the debt to the Trustee or Debtor,
4   because there is an uncertain line between suits
5   under Section 541 on a prepetition cause of action
6   and a turnover suit under Section 542 for the payment
7   of a prepetition debt.

8        A governmental unit's ability to defend on
9   the grounds of sovereign immunity may depend on how
10  the Court characterizes the suit.  And that's why I'm
11  explaining and emphasizing that I'm using 541 to
12  determine what is property of the estate, to then
13  determine that this is an en rem action, but,
14  essentially, it's a turnover request under Section
15  542.

16       So, at this time, I'm denying the
17  Defendant's request for dismissal on sovereign
18  immunity grounds.

19       The second issue that was left pending is
20  that the contract is null and void because the
21  principals of the corporation are not licensed
22  doctors and have the inability or incapacity to
23  contract for the services which the corporation is
24  rendering to the State Insurance Fund.

25       Based upon what I have seen as of this

1  moment, the documents in evidence that have been -- I

2  have read, which is basically the  petition and the

3  contract between the Debtor and the State Insurance

4  Fund, shows that this is a private corporation.

5          Under 14 Laws of Puerto Rico Annotated,

6  Section 2601 (b), corporations may be organized under

7  this subtitle to conduct or promote any lawful

8  business or purpose except those prohibited by the

9  Constitution and laws of the Commonwealth.

10          I have not seen any -- any prohibition

11  presented as of this moment as to this statutory

12  provision.

13          Now, there are also, under 14 Laws of Puerto

14  Rico Annotated, Section 3402 (a) and (b),

15  professional corporations -- that's professional

16  service corporations and professional corporations,

17  which are different from private corporations.  A

18  professional service corporation is any type of

19  professional service to the public which by law,

20  regulation, or jurisprudence could not be effected by

21  a corporation before the effective date of this Act

22  and for which the obtaining of the license or other

23  legal authorization for the rendering of such

24  services be required as a condition precedent.

25          But this is not a PSC.

1          Professional Corp.: A corporation which is

2  organized under this chapter with the sole and

3  exclusive purpose of rendering professional service

4  and the auxiliary or complementary service to such

5  professional service and which only has as

6  stockholders individuals who are duly licensed in the

7  Commonwealth to offer the same professional services

8  as a corporation.

9          This is not the case as of this moment of

10  the Debtor-Plaintiff corporation.

11          Now, I've read the -- and gone over the

12  decision of Colegios de Ingenieros y Agrimensores de

13  Puerto Rico vs. AAA de Puerto Rico, 131 DPR 735,

14  which bases its decision in Raza Engineering Corp.

15  vs. Dubón et al., 86 DPR 193.

16          The Court, Supreme Court of Puerto Rico

17  found that, in those cases, the corporations were

18  rendering services that should have been rendered by

19  duly certified professionals.

20          As of this moment, the contract, as I see

21  the contract, and the provider, that is, the Debtor-

22  Corp., binds itself to provide equipment, training,

23  and to provide the tele -- let me see what the term

24  is -- a tele-radiological network.  But, in that

25  provision of wherein they provide the places to

1  install the tele-radiological network, it states as

2  follows: The provided places to install a tele-

3  radiological network at all premises of the

4  corporation and establish a center for remote

5  readings with duly certified and licensed medical

6  faculty available for rendering the service that is

7  hereby hired.

8       So, the corporation, in name, should not be

9  rendering the services that as a doctor or duly

10  certified technicians should be rendering.

11       As of this moment, I don't have that

12  evidence.  So, that's why I'm denying the motion

13  without prejudice.  If Defendant can bring to the

14  Court evidence, let's say, that the principals may

15  have been -- as an example, alleged thergy -- are

16  reading X-rays, obviously that's -- that's beyond the

17  scope, and that would be -- render a different

18  result.

19       So, at this time, I'm denying without

20  prejudice the request to find the contract null and

21  void.  And I am not entering into any estoppel or

22  going against your own acts, defenses, that were

23  hinted by Counsel for Plaintiff.  I'm just finding

24  that, based upon the reading of the contract, the law

25  of Puerto Rico as to corporations, that there appears

1   no indication that the contract is null and void.

2           Now, those are my -- my two basic decisions.

3   Because, the issue of the jury trial has been

4   withdrawn by Plaintiff.  And, if Defendant is going

5   to invoke a jury trial, it has until the time that

6   the complaint is answered.  And, if that becomes an

7   issue, then we'll decide it.

8           Now, as to what is the interim emergency

9   remedy that will be provided to the Debtor, then I'll

10  ask the parties to make the proffer of what is that

11  agreement.

12          MR. MARINI:  Good afternoon, Your Honor.

13  This is Luís Marini for the State Insurance Fund.

14          May I ask a brief clarification about the

15  rulings?

16          THE COURT:  Yes.

17          MR. MARINI:  The Court, if I understood

18  correctly, found that sovereign immunity had been

19  waived as to the actions because it involved 542.

20          I did not follow within --

21          THE COURT:  Well, I find that this is an en

22  rem action.  And, because it's an en rem action,

23  Section 106 applies, and this Court has jurisdiction.

24

25          MR. MARINI:  I -- I understand, Your Honor.

1        THE COURT:  And this -- I know I gave a very
2   systematic decision.  I didn't have time to write it,
3   but that is the essence of my decision.  And I'm
4   using as a basis the Supreme Court decisions of Hood
5   and Katz.
6        MR. MARINI:  But I understood the decision.
7   I'm not -- I'm not certainly not arguing with it in
8   this case.
9        I just wanted -- I -- I didn't -- didn't
10  understand if it applied to the motion that was
11  scheduled for a hearing today or it was a
12  determination that sovereign immunity is waived for
13  all the allegations in the complaint.
14       That was my only request for clarification,
15  whether it is limited to the allegations raised and
16  the causes -- and the -- and the relief requested in
17  the motion of the hearing today, or it's a
18  determination of the complaint.
19       THE COURT:  My decision answers your motion
20  to dismiss at this juncture, to dismiss because the
21  contract is null and void.
22       And at this juncture, based upon what I have
23  seen, that this is an en rem action under 542, there
24  is sovereign -- I mean, the contract is not null and
25  void, and sovereign immunity does not apply.

1      MR. MARINI:  Okay.  Thank you, Your Honor.

2      I'll go ahead and make the proffer, if I

3  may.  As the Court mentioned, prior to going on the

4  record Counsel for the parties met in chambers and I

5  think have reached the agreement that I'm going to

6  proffer now.

7      I proffer, Your Honor, in general terms that

8  my client will -- will make a more specific proffer

9  as to some of the aspects I'm going to mention, for

10  the agreement in principle involves the following: my

11  client, as was the decision articulated during

12  argument, states and will reason to the Court that

13  they have complied with the terms of the agreement

14  and are going to continue complying with the terms of

15  the agreement.  And that representation my client

16  will make in a few seconds.

17      In addition, there are certain amounts that

18  have been reviewed and are uncontested or are pretty

19  close to being uncontested, part of them to be in

20  finalized review, that are going to be paid, and they

21  are as follows: today, there is a check for

22  $97,693.71 that is going to be paid by my client to

23  the Debtor.

24      There is a second payment -- and this is a

25  gross amount because a deduction of 7% would have to

1   be made -- of $99,017 that my client will pay on or
2   before next Friday, Friday of next week.

3        These payments are being made by my client
4   because they are -- have been reviewed in accordance
5   with the terms of the agreement and are available to
6   paying.

7        In addition, the parties have agreed to meet
8   next week and discuss potential -- any possibility of
9   settlement.  And, in the event that any such
10  settlement is not possible, inform the Court of the
11  status of the discussions and request a hearing to be
12  scheduled, for which we've already received a number
13  of dates.

14       And, finally, Your Honor -- and I understand
15  this applies to both sides -- this agreement is
16  without prejudice to any of the arguments and claims
17  and defenses that either my client or the Debtor may
18  have.

19       MR. GONZÁLEZ VÉLEZ:  Your Honor, González
20  for Debtor-Plaintiff.

21       That more or less is what was agreed.
22  Except, I understood that our meeting did not have to
23  go all the way to settling the whole case but could
24  be as to the reach of an interim agreement until the
25  case is heard if we don't agree to a settlement of

1  the case.  That was my understanding of it.

2          And, the other thing that maybe I -- this is

3  necessary -- I do understand that somebody's going to

4  sit in the witness chair and make the proffer.  And

5  then, that's it, Your Honor.

6          MR. MARINI:  (Off mic)

7          THE COURT:  Mr. Marini?

8          MR. MARINI:  Your Honor, Ms. Mayra Domenech

9  who is general counsel for the State Insurance Fund -

10  -

11          THE COURT:  Yes?

12          MR. MARINI:  -- will make the proffer.

13          THE COURT:  Sure.

14          MS. DOMENECH:  Good evening, Judge.  Yes.

15  Mayra Domenech on behalf of the State Insurance Fund.

16

17          We have already discussed with our Counsel,

18  our Brother Counsel, the terms of this agreement, and

19  we would comply with what has been previously stated

20  to this Honorable Court.

21          THE COURT:  Okay.  There are two clauses

22  which I think are critical to perhaps the controversy

23  between the parties.  And I'm just going to read

24  them, because I -- I -- obviously, the proffer is

25  made, and we are working and assuming that the

1   proffers and the contract will be complied with.

2           But, since there are allegations in the

3   complaint that they have not been complied with, I

4   just want to highlight them.  And one is -- I guess,

5   in the first part -- Capital (n) says that the

6   corporation shall refer all its patients first to the

7   provider, and, should it not have availability of

8   equipment or personnel for the required tests or

9   whenever the volume of patients is greater than the

10  capacity of the provider to render the services, the

11  corporation shall refer said patients to external

12  providers.  That's --

13          MR. MARINI:  Your Honor, can we use the

14  contract itself instead of the --

15          THE COURT:  I'm -- that's -- that's fine.

16  I'm reading from the one in English.

17          MR. MARINI:  For example, while I was

18  reviewing --

19          MR. GONZÁLEZ VÉLEZ:  If Your Honor -- I -- I

20  want to -- we endorse that it be read in Spanish,

21  Your Honor.  A 100% (Off mic)  it's like an

22  inaccuracy the translation.

23          THE COURT:  Well, I'm -- I'm just reading

24  from the document that's --

25          MR. GONZÁLEZ VÉLEZ:  I know.  We submit,

1  Your

2  Honor, --

3        THE COURT:  But in Spanish it says La

4  Corporación referirá todos sus pacientes en primer

5  orden al Proveedor.  Y de éste no tener disponible

6  sus equipos y personal para la pruebas requeridas, o

7  cuando el volumen de pacientes sea mayor que la

8  capacidad de el Proveedor para prestar los servicios,

9  la Corporación referirá dichos pacientes a

10  proveedores externos.

11        That's -- that's the Spanish.

12        The other clause refers to the payments.

13        MR. GONZÁLEZ VÉLEZ:  It's (c), Your Honor.

14  The following (c) (sic) (Off mic).

15        THE COURT:  I had it marked, and I lost it.

16     (Documents are reviewed)

17        THE COURT:  Okay.  (c).  I'm going to read

18  it in English and in Spanish.

19        The corporation shall process said invoices

20  in accordance with the accounting law of the

21  government of Puerto Rico and to all applicable

22  procedures pursuant to currently enforceable public

23  and administrative policy in effect and shall proceed

24  to issue the corresponding payments within the least

25  amount of time possible.

1          For this to be so, it is indispensable for

2    each invoice to contain the required information in

3    all its parts and be accompanied by the attachments

4    and/or necessary documents for processing payment.

5          Likewise, it is an indispensable condition

6    that the services to have been provided pursuant to

7    applicable laws, regulations, norms, and procedures

8    demanded by the corporation.

9      (Documents are reviewed)

10         MR. MARINI:  It's in page 5 of the Spanish

11   version.

12         THE COURT:  In Spanish, it's: (Citing

13   Spanish language version of previously read English

14   version)

15         I think those are key.

16         MS. DOMENECH:  Yes, Your Honor.  And the

17   State Insurance Fund does state that it will keep and

18   accompany with the terms of the contract as stated by

19   the Hon. Judge.

20         MR. GONZÁLEZ VÉLEZ:  One question, Your

21   Honor?

22         THE COURT:  Yes?

23         MR. GONZÁLEZ VÉLEZ:  I would like to know

24   that Sister Counsel -- and please excuse the question

25   -- is duly authorized to represent the State

1    Insurance Fund and her principal and officers that
2    are going to make this proffer.  And I realize that
3    it's probably an absurd requirement, but I will like
4    to have it.
5            THE COURT:  Well, as general counsel of the
6    State Insurance Fund, I am assuming that she
7    represents the State Insurance Fund.
8            MS. DOMENECH:  I do, Your Honor.
9            MR. GONZÁLEZ VÉLEZ:  Please excuse, Your
10   Honor.  I just wanted to ...
11           THE COURT:  Okay.  And, as to settlement,
12   which you've mentioned, I understand that, at this
13   stage, individually you're discussing interim
14   settlement, but that does not mean that you cannot
15   discuss ultimate settlement after you have opened
16   your records and discovery, perhaps to be in a better
17   position to inform the Court.
18           MR. GONZÁLEZ VÉLEZ:  (Off mic)  as they say,
19   a Spanish saying.  And my client -- and, certainly, I
20   I endorse it.  And Judge Toruellas says that we
21   should settle everything, and he should know.
22           So, -- so, I -- yes, Your Honor.
23           THE COURT:  And -- and, if, as discussed in
24   chambers, the parties are going to meet next week and
25   try to exchange as much information as possible and

1    to put each other in a position to determine what is

2    the reasonable interim agreement that the parties

3    should enter into, and perhaps with a view towards a

4    more formal ultimate agreement.

5            MR. GONZÁLEZ VÉLEZ:  Yes, Your Honor.

6            THE COURT:  But, if that's not -- if that is

7    not accomplished, since I understand that certaincy

8    as to checks are only for this week and the next

9    week, then you move the Court -- and I have already

10   expressed to Counsel that we have cleared July 1, 2,

11   or 7 -- that's not all three days, that means 1 or 2

12   or 7.  Because, I also have a list of other emergency

13   cases which are waiting.

14           MR. GONZÁLEZ VÉLEZ:  Your Honor, it's very

15   generous.

16           THE COURT:  So, ...

17           MR. MARINI:  Your Honor, I -- I would just

18   mention that, as I mentioned in chambers, I want to

19   check my calendar.          THE COURT:  And -- and,

20   just to make it clear and to make it more expedited,

21   I am going to request any witness that the party

22   would present that direct would be through a sworn

23   statement, then the witness will sit and we cross

24   examine him.  That way, it will be faster.

25           And, if a witness is going to refer to

1   documents, then they should be attached also.

2           MR. GONZÁLEZ VÉLEZ:  How many days -- well,

3   we'll deal with that later, Your Honor.  We'll deal

4   with that later.            Would a statement under

5   penalty suffice?

6           THE COURT:  A statement under penalty of

7   perjury.

8           MR. GONZÁLEZ VÉLEZ:  Thank you.

9           MR. MARINI:  May I just confirm my --

10          MR. GONZÁLEZ VÉLEZ:  Thank you, Your Honor.

11          THE COURT:  Any other matter in this case?

12          MR. MARINI:  There are none from my side.  I

13   would just clarified, as I mentioned --

14          THE COURT:  But let me -- I -- I -- perhaps

15   I -- I don't know if I answered your question as to

16   whether this is a ruling for the case or a ruling for

17   this motion.  Maybe I -- what is your specific

18   question?

19          MR. GONZÁLEZ VÉLEZ:  You did, I think.

20          MR. MARINI:  I thought you answered it, Your

21   Honor.

22          THE COURT:  Okay.

23          MR. GONZÁLEZ VÉLEZ:  Yes, you did, Your

24   Honor.

25          MR. MARINI:  For me, Your Honor, I just

84

1   wanted to clarify, as I mentioned in chambers, that I

2   am not available on the first.  I don't have my

3   calendar.  And my client's not available on the

4   second.  But we are available on the seventh.  And I

5   -- we'll coordinate that with Brother Counsel and the

6   courtroom deputy if it becomes necessary.

7          THE COURT:  Thank you very much.  You're

8   excused.

9          MR. MARINI:  Thank you, Your Honor.

10         MR. GONZÁLEZ VÉLEZ:  Thank you very much.

11         THE COURT:  Court's adjourned.

12     (Hearing in this matter is hereupon concluded for

13  this day)

14                              (4:00 p.m.)

15

16

17

18

19

20

21

22

23

24

25

CERTIFIED TRANSCRIBERS, INC.
1075 Carr. 2 Plaza Suchville #302
Bayamón, Puerto Rico 00959
Tel. # (787) 783-6623; (787) 617-9487

1          TRANSCRIBER CERTIFICATION

2

3          I, CRYSTAL INCHAUSTEGUI BREAZ, Transcriber,

4     do hereby certify that the foregoing transcript was

5     transcribed by me to the best of my abilities.

6

7          I CERTIFY that all "(inaudible)" were

8     carefully reviewed and found to be as written.

9

10          I FURTHER CERTIFY that I am not interested in

11     the outcome of the case mentioned in said caption.

12

13          WITNESS MY HAND this 13 day of the month of

14     July, 2010 in San Juan, Puerto Rico.

15

16               S/ CRYSTAL INCHAUSTEGUI

17               CRYSTAL INCHAUSTEGUI BREAZ

18

19     I, DIANE BREAZ, RPR and Official Court Reporter for

20     the District Court of Puerto Rico, certify that the

21     foregoing transcript has been verified and certified

22     by me.

23

24               S/ DIANE BREAZ

25               DIANE BREAZ

CERTIFIED TRANSCRIBERS, INC.
1075 Carr. 2 Plaza Suchville #302
Bayamón, Puerto Rico 00959
Tel. # (787) 783-6623; (787) 617-9487